# FEDERAL DEPOSIT INSURANCE CORPORATION *v.* ALLAN A. CRYSTAL, COMMISSIONER OF REVENUE SERVICES

# FEDERAL DEPOSIT INSURANCE CORPORATION *v.* JAMES E. MEEHAN, COMMISSIONER OF REVENUE SERVICES
## (SC 16079)

McDonald, C. J., and Borden, Norcott, Palmer and Callahan, Js.

Argued September 22—officially released December 28, 1999

*William H. Narwold*, with whom were *Jaclyn C. Taner*, pro hac vice, *Charles D. Ray* and, on the brief, *Ann S. DuRoss*, pro hac vice, and *Colleen Boles*, pro hac vice, for the appellants (plaintiff in each case).

*Paul M. Scimonelli*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal*, attorney general, for the appellees (defendant in each case).

*Janet C. Spegele* and *Michael E. Malamut,* pro hac vice, filed a brief for the Connecticut Business and Industry Association as amicus curiae.

*Opinion*

BORDEN, J. The issue in this joint appeal concerns the scope of de novo review of a deficiency tax assessment pursuant to General Statutes § 12-237.[1] The plaintiff in both cases, the Federal Deposit Insurance Corporation (FDIC), as receiver of New Connecticut Bank and Trust Company, N.A., and of New England Savings Bank (New England), appeals[2] from the judgments of the trial court, following a joint trial, dismissing certain counts of the FDIC's complaints in both

[1] General Statutes § 12-237 provides: "Any taxpayer aggrieved because of any order, decision, determination or disallowance of the Commissioner of Revenue Services under the provisions of this part may, within one month after service upon the taxpayer of notice of such order, decision, determination or disallowance, take an appeal therefrom to the superior court for the judicial district of Hartford, which shall be accompanied by a citation to the Commissioner of Revenue Services to appear before said court. Such citation shall be signed by the same authority, and such appeal shall be returnable at the same time and served and returned in the same manner, as is required in case of a summons in a civil action. The authority issuing the citation shall take from the appellant a bond or recognizance to the state of Connecticut, with surety to prosecute the appeal to effect and to comply with the orders and decrees of the court in the premises. Such appeals shall be preferred cases, to be heard, unless cause appears to the contrary, at the first session, by the court or by a committee appointed by it. Said court may grant such relief as may be equitable and, if such tax has been paid prior to the granting of such relief, may order the Treasurer to pay the amount of such relief, with interest at the rate of eight per cent per annum, to the aggrieved taxpayer. If the appeal has been taken without probable cause, the court may tax double or triple costs, as the case demands; and, upon all such appeals which may be denied, costs may be taxed against the appellant at the discretion of the court, but no costs shall be taxed against the state."

[2] On January 6, 1991, the United States Comptroller of the Currency, acting pursuant to 12 U.S.C. § 191, declared Connecticut Bank and Trust Company, N.A., insolvent and, pursuant to 12 U.S.C. § 1821 (c) (2), appointed the FDIC as its receiver. The FDIC, pursuant to 12 U.S.C. § 1821 (n), caused a new nationally chartered banking association to be created, namely, New Connecticut Bank and Trust Company, N.A. On July 13, 1991, the Comptroller, pursuant to 12 U.S.C. § 1821 (n) (12) and (c) (2), appointed the FDIC as

cases for lack of subject matter jurisdiction.[3] The FDIC had appealed to the trial court, pursuant to § 12-237, from certain deficiency assessments imposed by the defendant, the commissioner of revenue services (commissioner), pursuant to General Statutes § 12-233,[4] and

receiver of New Connecticut Bank and Trust Company, N.A. As receiver, the FDIC succeeded to all assets and liabilities of that bank by operation of law, including the claim for the return of protested tax payments that has become the subject of the present case. We refer herein to both Connecticut Bank and Trust Company, N.A., and New Connecticut Bank and Trust Company, N.A., as CBT.

On May 21, 1993, in *Shulansky* v. *New England Savings Bank*, Superior Court, judicial district of New London, Docket No. CV930526879S (May 21, 1993), the FDIC was appointed receiver of New England and was ordered to wind up its business affairs. The FDIC, pursuant to 12 U.S.C. § 1812 (c) (3) (A), executed an acceptance of the appointment as receiver. As receiver, the FDIC succeeded to all assets and liabilities of New England by operation of law, including the claim for the return of protested tax payments that has become the subject of the present case.

For the sake of simplicity, we refer herein to the FDIC as the party that filed the two tax appeals in the trial court. We refer herein to CBT and New England collectively as the banks.

Pursuant to Practice Book § 63-4 (4), the FDIC filed a joint appeal from the judgments of the trial court to the Appellate Court, and we transferred the joint appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

[3] In the CBT case, the trial court rendered judgment on the merits in favor of the defendant, the commissioner of revenue services, as to the first, second and third counts of the amended complaint, and dismissed the fourth, fifth and sixth counts. In the New England case, the trial court rendered judgment on the merits in favor of the defendant, the commissioner of revenue services, as to the first count of the amended complaint, and dismissed the second, third and fourth counts. The FDIC does not challenge the respective judgments on the merits. Thus, only the propriety of the trial court's dismissals of the respective counts in the two amended complaints is involved in this appeal.

[4] General Statutes § 12-233 provides: "The commissioner shall, (1) in the case of a return on which an operating loss is not reported, within three years after the due date for the filing of such return or within three years after the date on which such return was received by him, whichever period expires later, or (2) in the case of a return on which an operating loss is reported, within three years after the due date or the date of receipt by the commissioner, whichever period expires later, of the return on which a carry-over of such loss is fully utilized or deemed fully utilized because such loss is not available for deduction in any subsequent income year, examine

challenged administratively by the banks pursuant to General Statutes § 12-236.[5] The common basis of the trial court's dismissals, with respect to the claims

it and, in case any error is disclosed by such examination, shall, within thirty days after such disclosure, notify the taxpayer thereof. When it appears that any part of the deficiency for which a deficiency assessment is made is due to negligence or intentional disregard of the provisions of this part or regulations promulgated thereunder, there shall be imposed a penalty equal to ten per cent of the amount of such deficiency assessment, or fifty dollars, whichever is greater. When it appears that any part of the deficiency for which a deficiency assessment is made is due to fraud or intent to evade the provisions of this part or regulations promulgated thereunder, there shall be imposed a penalty equal to twenty-five per cent of the amount of such deficiency assessment. No taxpayer shall be subject to more than one penalty under this section in relation to the same tax period. Any decision rendered by any federal court holding that a taxpayer has filed a fraudulent return with the Director of Internal Revenue shall subject the taxpayer to the penalty imposed by this section without the necessity of further proof thereof, except when it can be shown that the return to the state so differed from the return to the federal government as to afford a reasonable presumption that the attempt to defraud did not extend to the return to the state. Within thirty days of the mailing of such notice, the taxpayer shall pay to the commissioner, in cash or by check, draft or money order drawn to the order of the Commissioner of Revenue Services, any additional amount of tax shown to be due by the corrected return or shall be paid by the State Treasurer, upon order of the Comptroller, any amount shown to be due it by such corrected return. The failure of the taxpayer to receive any timely mailed notice required by this section shall not relieve him of the obligation to pay the tax assessed under the terms of this part or any interest or penalties thereon. When, before the expiration of the time prescribed in this section for the examination of the return or the assessment of the tax, both the commissioner and the taxpayer have consented in writing to such examination or assessment after such time, the return may be examined and the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon. The commissioner may also in such a case waive the statute of limitations against a claim for refund by such taxpayer."

[5] General Statutes § 12-236 provides: "Any taxpayer, aggrieved by the action of the commissioner or his authorized agent in fixing the amount of any tax, penalty or interest provided for by this part, may apply to the commissioner, in writing, within sixty days after the notice of such action is delivered or mailed to it, for a hearing and a correction of the amount of the tax, penalty or interest so fixed, setting forth the reasons why such hearing should be granted and the amount in which such tax, penalty or interest should be reduced. The commissioner shall promptly consider each

asserted in those counts, was that because the banks had not filed amended returns and claims for refunds pursuant to General Statutes § 12-225 (b) (1),[6] intertwined principles of sovereign immunity and exhaustion of administrative remedies deprived the court of subject matter jurisdiction over those counts. The FDIC claims that the scope of de novo review afforded by § 12-237 provided the court with subject matter jurisdiction over the counts of the complaints in question. We

such application and may grant or deny the hearing requested. If the hearing is denied, the applicant shall be notified thereof forthwith. If it is granted, the commissioner shall notify the applicant of the time and place fixed for such hearing. After such hearing the commissioner may make such order in the premises as appears to him just and lawful and shall furnish a copy of such order to the applicant. The commissioner may, by notice in writing, at any time within three years after the date when any return of any taxpayer has been due, order a hearing on his own initiative and require the taxpayer or any other individual whom he believes to be in possession of relevant information concerning the taxpayer to appear before him or his authorized agent with any specified books of account, papers or other documents, for examination under oath."

[6] General Statutes § 12-225 (b) (1) provides: "Any company which fails to include in its return items of deductions or includes items of nontaxable income or makes any other error in such return may, within three years from the due date of the return, file with the commissioner an amended return, together with a claim for refund of taxes overpaid as shown by such amended return. Failure to file a claim within the time prescribed in this section constitutes a waiver of any demand against the state on account of overpayment. The commissioner shall, within one hundred eighty days of the receipt of such claim, determine whether such claim is valid and, if so, the commissioner shall notify the State Comptroller of the amount of such refund and the State Comptroller shall draw an order on the State Treasurer in the amount thereof for payment to such company. If the commissioner determines that such claim is not valid, either in whole or in part, he shall mail notice of the proposed disallowance in whole or in part of the claim to the company which notice shall set forth briefly the commissioner's findings of fact and the basis of disallowance in each case decided in whole or in part adversely to the claimant. Sixty days after the date on which it is mailed, a notice of proposed disallowance shall constitute a final disallowance except only for such amount as to which the company has filed, as provided in subdivision (2) of this subsection, a written protest with the commissioner. For the purposes of computing any refund due or adjusting net income as a result of the inclusion of income, the taxation of which by the state of Connecticut is prohibited by federal law, including the Constitu-

conclude that, under the circumstances of this case, the failure of the banks to have filed amended returns and claims for refunds pursuant to § 12-225 (b) (1) did not deprive the trial court of jurisdiction to consider the FDIC's claims. We therefore reverse the judgments of dismissal of the trial court.

The legal background, facts and procedural history are undisputed. Since 1979, corporate taxpayers such as the banks, in general, have been required to include as gross income, for purposes of the state's corporation business tax; General Statutes §§ 12-213 through 12-242i; interest income received from federal, state and local bonds, as well as from other securities and obligations. Moreover, under the corporation business tax, although a deduction is permitted for interest expenses incurred in holding bonds the income from which is taxable under the federal income tax, no such deduction is permitted for such expenses incurred in holding bonds the income from which is exempt from tax under the federal income tax. In 1996, this court, in *D.A. Pincus & Co.* v. *Meehan*, 235 Conn. 865, 880, 670 A.2d 1278 (1996), concluded that such diverse treatment did not violate the equal protection clauses of the federal and state constitutions. Furthermore, in contrast to the general taxability under the state corporation business tax of the income from federal, state and local bonds, from 1979 until 1995, the state, pursuant to various specific statutes, exempted from gross income under the state corporation business tax the interest income earned from certain Connecticut state and local bonds.[7]

tion of the United States, as applied, no expenses related to such income shall be deducted in computing net income under this chapter."

[7] These bonds included the following: Municipal Housing Finance Assistance Bonds, issued pursuant to chapter 137a of the General Statutes, exempt pursuant to General Statutes § 8-312; Bradley Bonds, issued pursuant to General Statutes §§ 15-101k through 15-101p, exempt pursuant to General Statutes § 15-101o (a); Connecticut Higher Education Supplemental Loan Authority Bonds, issued pursuant to chapter 187b of the General Statutes, exempt pursuant to General Statutes § 10a-236; Infrastructure Bonds, issued pursuant to General Statutes §§ 13b-74 through 13b-77, exempt pursuant to

It is also undisputed that, until 1991, CBT was a federally chartered national bank qualified to do business in this state and subject to the state corporation business tax. CBT owned federal and municipal bonds during the tax years of 1983 through 1987. In its tax returns for the tax years 1983 through 1985, the first audit period, CBT included in gross income the interest earned from the federal and municipal bonds that it held, and deducted its interest expenses incurred in buying and holding such bonds. After auditing CBT's 1983, 1984 and 1985 tax returns, the commissioner, in August, 1988, sent CBT audit workpapers showing a proposed tax recalculation of $2,112,532, plus interest. Following an informal conference with the commissioner, CBT received from the commissioner revised first audit workpapers adjusting the proposed tax recalculation to $2,175,329, plus interest. The audit results were based on the commissioner's disallowance of the deduction taken by CBT for interest expenses related to the federally tax exempt municipal bonds. CBT made a partial payment of $3,000,000 on the tax recalculation for the first audit period.[8] CBT also made a claim for a refund of that payment, and preserved its rights to protest further and to appeal any and all audit adjustments. Thereafter, in September, 1991, the commissioner sent the FDIC, which by then had become the receiver of CBT, a determination letter.

Meanwhile, the commissioner also audited CBT's 1986 and 1987 tax returns, the second audit period, and

General Statutes § 13b-77 (a); and Municipal Resource Recovery Bonds, issued pursuant to chapter 103b of the General Statutes, exempt pursuant to General Statutes § 7-273mm (a).

In 1995, the state repealed the corporation business tax exemptions for the interest on these bonds. See General Statutes c. 208b. The repeal does not affect the tax years in question in the present case.

[8] Presumably, the difference between the amount of this payment, and of all other payments discussed herein, and the amounts claimed by the commissioner pursuant to the audits, is accounted for by the amounts of interest accumulated since the tax years in question.

issued a proposed tax recalculation indicating that CBT owed additional taxes for the second audit period, also based on disallowance of the interest expense deduction taken by CBT in connection with holding the federally tax exempt municipal bonds. In November, 1988, CBT made a partial payment of $1,800,000 on the second audit period tax recalculation. This payment also was made under protest with a claim for a refund of the payment, together with a preservation of CBT's right to protest and to appeal any tax adjustment. In June, 1990, the commissioner issued a billing notice for the second audit period to CBT for the assessment of $1,594,231, plus interest.

Pursuant to § 12-236, CBT requested a hearing and a correction of the two deficiency tax assessments. Thereafter, in September, 1991, the commissioner sent the FDIC, as receiver for CBT, a determination letter notifying it that the request for a correction was denied, and that the commissioner had determined that CBT owed an additional $386,817 for the second audit period. In October, 1991, pursuant to § 12-237, the FDIC filed its appeal in the present case to the trial court from the two deficiency assessments.

Until 1993, New England was a state chartered, federally insured bank that was subject to the state corporation business tax. New England owned federal and municipal obligations during 1986. In its 1986 corporation business tax return, New England included in income the interest earned from the federal and municipal bonds that it held, and deducted its interest expenses incurred in buying and holding such bonds. In May, 1988, after auditing New England's tax returns for the tax year 1986, the commissioner issued to New England a notice of assessment of an additional tax for 1986, in the amount of $17,654, plus interest, on the ground that New England improperly had deducted

interest expenses incurred in holding the federally tax exempt municipal bonds.

Pursuant to § 12-236, New England applied for a hearing and a correction of the tax assessed. New England also made a protest payment of $21,773.28. Thereafter, the commissioner notified New England that its request for a correction was denied. In April, 1990, pursuant to § 12-237, New England filed its appeal in the present case to the trial court from the deficiency assessment.[9]

The commissioner's deficiency assessments against both CBT and New England were based on the disallowance of certain deductions taken by the banks for expenses related to municipal bond income. That type of income is exempt from federal taxation, but is taxable under our state corporate business tax. At the administrative level, the banks had claimed that the state's different tax treatment[10] of federally tax exempt bonds, such as municipal bonds, versus federally taxable bonds, such as corporate bonds, discriminated against holders of the former as against holders of the latter in violation of the equal protection clauses of the state and federal constitutions. We refer herein to this claim as the FDIC's equal protection theory. Thus, the tax dispute arising out of the question of the validity of the banks' equal protection theory was whether the banks had overstated their deductions against an aspect of their gross income, namely, municipal bond income,

---

[9] Thereafter, the FDIC was substituted as the plaintiff. See footnote 2 of this opinion.

[10] Under General Statutes § 12-217 (a) (1) (A), only items that are deductible under federal income tax law are deductible under the state corporate business tax. The federal government does not tax the income on municipal bonds and, therefore, does not recognize deductions for expenses incurred in connection with such bonds. Unlike the federal government, however, Connecticut *does* tax at least some municipal bonds. Therefore, under the state corporation business tax, there is no deduction for expenses incurred in connection with municipal bonds.

thereby understating their net income for purposes of the corporation business tax.

The FDIC's appeals in both cases were stayed pending the outcome of *D.A. Pincus & Co.* v. *Meehan*, supra, 235 Conn. 865. On January 30, 1996, this court released its decision in *D.A. Pincus & Co.*, rejecting the equal protection theory.

Thereafter, the FDIC, with the permission of the trial court, *Maloney, J.*, amended its complaints in both the CBT and New England cases to add a new theory challenging the deficiency assessments. Under this new theory, the FDIC claimed that the fact that the state taxes interest income on federal bonds while exempting from taxation interest income from certain state and municipal bonds; see footnote 7 of this opinion and accompanying text; violated the borrowing clause[11] and the supremacy clause[12] of the United States constitution, and the doctrine of intergovernmental tax immunity as codified by 31 U.S.C. § 3124. We refer herein to this claim as the FDIC's intergovernmental tax immunity theory.

Under the intergovernmental tax immunity theory, the FDIC claims that, with respect to the federal bond interest income, the banks paid an invalid tax. Thus, under this theory, the question would be whether the banks had overstated their gross income by the total amount of the interest income on their federal bonds. In other words, in the amended complaints, the FDIC claimed that the *understatement*, if any, of their municipal bond income, resulting from the unjustified deductions for the interest expenses related thereto, was offset by the alleged *overstatement* of their federal bond income. The amounts of the alleged overpayments of the tax by the banks are far greater than the deficiency

[11] U.S. Const., art. I, § 8.
[12] U.S. Const., art. VI, cl. 2.

assessments against both banks.[13] In its amended complaints, however, the FDIC did not seek a full refund of those alleged overpayments. Instead, the FDIC sought only a refund of the amount of the deficiency assessments that the banks had paid under protest. After a joint trial, the trial court, *McWeeny, J.*, dismissed the counts related to the intergovernmental tax immunity theory. The court reasoned that the failure of the banks to have filed an amended return and claim for a refund pursuant to § 12-225 (b) (1); see footnote 6 of this opinion; based on the intergovernmental theory, deprived the court of subject matter jurisdiction over those counts. This joint appeal followed.

The parties do not dispute that "a tax appeal pursuant to § 12-237 affords a taxpayer a trial de novo." *Schlumberger Technology Corp.* v. *Dubno,* 202 Conn. 412, 421, 521 A.2d 569 (1987). The dispute between the parties relates to the scope and meaning of de novo review of the FDIC's challenge under § 12-237 to the commissioner's deficiency assessments. The FDIC claims that, by virtue of the de novo standard of review applied under § 12-237, the court had subject matter jurisdiction over the counts that were based on the intergovernmental theory. We agree.

There is no question, and the FDIC does not contend otherwise, that if it were seeking, based on the intergovernmental theory, a refund of the amounts of corporation business taxes that the banks allegedly had overpaid for the years in question, their failure to follow the procedures set forth in § 12-225 (b) (1) would deprive the court of subject matter jurisdiction over such a claim. Section 12-225 (b) (1) provides in relevant part: "Any company which fails to include in its return

---

[13] The FDIC offered evidence at trial that CBT had paid at least $12,173,443 in taxes on income from the interest on federal obligations for the tax years from 1983 through 1987, and that New England had paid at least $186,093 in taxes for the tax year 1986.

items of deduction or includes items of nontaxable income or makes any other error in such return may, within three years from the due date of the return, file with the commissioner an amended return, together with a claim for refund of taxes overpaid as shown by such amended return. Failure to file a claim within the time prescribed in this section constitutes a waiver of any demand against the state on account of overpayment. . . ." Section 12-225 "establishes an administrative request for a refund as the prescribed avenue of relief that the [FDIC was] required to follow in order to take advantage of the state's limited waiver of its sovereign immunity. We have frequently held that where a statute has established a procedure to redress a particular wrong a person must follow the specified remedy and may not institute a proceeding that might have been permissible in the absence of such a statutory procedure. *Norwich* v. *Lebanon*, 200 Conn. 697, 708, 513 A.2d 77 (1986). When an adequate administrative remedy exists at law, a litigant must exhaust it before the Superior Court will obtain jurisdiction over an independent action on the matter." (Internal quotation marks omitted.) *Owner-Operators Independent Drivers Assn. of America* v. *State*, 209 Conn. 679, 686–87, 553 A.2d 1104 (1989). Thus, intertwined principles of sovereign immunity and exhaustion of administrative remedies would require that any claim for a refund of taxes allegedly overpaid, based on the intergovernmental theory, be preceded by a timely amended return and claim for such a refund pursuant to § 12-225. Id., 686.

In the present case, however, the FDIC does not claim such a refund. Instead, it seeks to regain the amounts paid under protest in response to the commissioner's deficiency assessments. The more narrow question posed by this case, therefore, is whether the FDIC may utilize the same legal theory that would have underlain such a claim for a refund, not for the purpose of seeking

a refund of the taxes that the banks paid, but in order to offset additional taxes in the form of deficiency assessments imposed by the commissioner. We conclude that the FDIC may do so.

First, our precedents on the scope of de novo review of tax determinations counsel that the court has jurisdiction over the FDIC's claims based on the intergovernmental theory. In *Schlumberger Technology Corp.* v. *Dubno*, supra, 202 Conn. 421, we held that the de novo scope of review of a tax appeal from an administrative tax proceeding included a legal claim that "did not entirely track the discretionary nature of the petitions that [the plaintiff] had filed at the administrative level . . . ." Moreover, we referred to this inconsistency between the claim made at trial pursuant to § 12-237 and the claim made at the administrative level as a "procedural impropriety"; id., 421–22; rather than a defect of subject matter jurisdictional dimension.

In *Konover* v. *West Hartford*, 242 Conn. 727, 734–35, 699 A.2d 158 (1997), we addressed the scope and meaning of de novo review in a municipal property tax appeal under General Statutes § 12-117a.[14] The property owner

---

[14] General Statutes § 12-117a provides: "Any person, including any lessee of real property whose lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes, claiming to be aggrieved by the action of the board of tax review or the board of assessment appeals, as the case may be, in any town or city may, within two months from the date of the mailing of notice of such action, make application, in the nature of an appeal therefrom, with respect to the assessment list for the assessment year commencing October 1, 1989, October 1, 1990, October 1, 1991, October 1, 1992, October 1, 1993, October 1, 1994, or October 1, 1995, and with respect to the assessment list for assessment years thereafter, to the superior court for the judicial district in which such town or city is situated, which shall be accompanied by a citation to such town or city to appear before said court. Such citation shall be signed by the same authority and such appeal shall be returnable at the same time and served and returned in the same manner as is required in case of a summons in a civil action. The authority issuing the citation shall take from the applicant a bond or recognizance to such town or city, with surety, to prosecute the application to effect and to comply with and conform to the orders and decrees of the court in the premises. Any such application

had appealed from the assessment of the municipal board of tax review to the trial court claiming that he had been overassessed. Id., 729–30. At trial, the town introduced evidence indicating that a portion of the property owner's land inadvertently had been omitted in the original assessment and, therefore, the board of tax review was not aware of the actual area of the land. Id., 731–33. This evidence would have suggested an original underassessment by the town that would have offset the overassessment claimed by the property owner. The trial court, however, in determining the fair market value of the property, declined to consider this evidence because it had not been presented to the board of tax review. Id., 734.

shall be a preferred case, to be heard, unless good cause appears to the contrary, at the first session, by the court or by a committee appointed by the court. The pendency of such application shall not suspend an action by such town or city to collect not more than seventy-five per cent of the tax so assessed or not more than ninety per cent of such tax with respect to any real property for which the assessed value is five hundred thousand dollars or more, and upon which such appeal is taken. If, during the pendency of such appeal, a new assessment year begins, the applicant may amend his application as to any matter therein, including an appeal for such new year, which is affected by the inception of such new year and such applicant need not appear before the board of tax review or board of assessment appeals, as the case may be, to make such amendment effective. The court shall have power to grant such relief as to justice and equity appertains, upon such terms and in such manner and form as appear equitable, and, if the application appears to have been made without probable cause, may tax double or triple costs, as the case appears to demand; and, upon all such applications, costs may be taxed at the discretion of the court. If the assessment made by the board of tax review or board of assessment appeals, as the case may be, is reduced by said court, the applicant shall be reimbursed by the town or city for any overpayment of taxes, together with interest and any costs awarded by the court, or, at the applicant's option, shall be granted a tax credit for such overpayment, interest and any costs awarded by the court. Upon motion, said court shall, in event of such overpayment, enter judgment in favor of such applicant and against such city or town for the whole amount of such overpayment, together with interest and any costs awarded by the court. The amount to which the assessment is so reduced shall be the assessed value of such property on the grand lists for succeeding years until the tax assessor finds that the value of the applicant's property has increased or decreased."

We reversed the trial court's judgment, however, concluding that "[t]he scope of a trial court's subject matter jurisdiction in such an appeal must encompass the power to consider any facts that are relevant to determining whether a taxpayer actually has been overassessed." Id., 741. We first discussed the well established principles of subject matter jurisdiction. "Jurisdiction of the subject-matter is the power [of the court] to hear and determine cases of the general class to which the proceedings in question belong. . . . A court has subject matter jurisdiction if it has the authority to adjudicate a particular type of legal controversy. . . . It is a familiar principle that a court which exercises a limited and statutory jurisdiction is without jurisdiction to act unless it does so under the precise circumstances and in the manner particularly prescribed by the enabling legislation." (Internal quotation marks omitted.) Id., 740–41. We also explained that "[i]n a de novo proceeding, the trier of fact makes an independent determination of the matters on which the appeal was taken without regard for the action or decision of the lower tribunal." Id., 741. This conclusion was not altered by the fact that the particular evidence of underassessment had not been presented to the board of tax review. Id., 742.

Thus, the reasoning of *Schlumberger Technology Corp.* and *Konover* rested on two related factors, namely, that in de novo tax appeals under § 12-117a and § 12-237: (1) the court's subject matter jurisdiction includes the power to consider all factors relevant to the determination of the tax liability in question; and (2) that consideration is independent of the action or decision at the administrative tribunal. We conclude that this reasoning governs the present case as well.

In this case, the judicial determination of the FDIC's tax liability involved the question of whether it owed additional amounts of the corporation business tax for

the years in question, over and above what already had been paid regarding that tax. The trial court's subject matter jurisdiction under § 12-237 included the power to consider all factors relevant to the determination of that additional tax liability. Although the legal basis of the FDIC's claims for refunds of the deficiency assessments differed from the bases of the assessments and from what it claimed at the administrative level, the ultimate question presented to the trial court was, nevertheless, whether the FDIC owed an additional amount of its corporation business tax. In addition, the court was required to arrive at that judicial determination independently of the action or decision of the administrative tribunal from which the tax appeal was taken. De novo review in this context means, therefore, that the trial court was not confined to the particular legal theory underlying the resistance to the deficiency assessments that was asserted administratively.

Second, the trial court was "[v]ested with full power, under § 12-237, to 'grant such relief as may be equitable' . . . ." *Schlumberger Technology Corp.* v. *Dubno,* supra, 202 Conn. 422. Section 12-225 (b) (1) provides that if a company "includes items of nontaxable income or makes any other error in [its] return [it is required], within three years from the due date of the return, [to] file with the commissioner an amended return, together with a claim for refund of taxes overpaid as shown by such amended return . . . [and that the] [f]ailure to [do so] constitutes a waiver of any demand against the state on account of overpayment. . . ." Thus, § 12-225 (b) (1) provides the requisite administrative procedure for "a claim for refund of taxes overpaid . . . ." In the present case, however, the FDIC does not seek such refunds. It seeks only the additional corporate business taxes involved in the deficiency assessments. Therefore, although the banks, by not timely following the provisions of § 12-225 (b) (1), forfeited their right to

seek refunds, based on the intergovernmental theory, of the allegedly unjustified taxes that they voluntarily had paid, it is consistent with principles of equity to permit them to avail themselves of that theory, if valid, to regain the *additional* taxes imposed by the deficiency assessments that they had paid under protest.

Finally, we see no difference between the language of the tax appeal statute involved in *Konover* and § 12-237. Section 12-117a empowers the trial court to hear and determine appeals taken by taxpayers "aggrieved by the action of the board of tax review . . . [and] to grant such relief as to justice and equity appertains . . . ." In similar fashion, § 12-237 empowers the trial court to hear and determine appeals taken by taxpayers "aggrieved because of any order, decision, determination or disallowance of the Commissioner . . . [and to] grant such relief as may be equitable . . . ." Although the language of the two statutes is not identical, we perceive no textual reason why the scope and meaning of the de novo tax appeal under § 12-117a explicated in *Konover* should not apply equally to a de novo tax appeal under § 12-237.

The commissioner argues that the intergovernmental tax immunity theory properly could have been raised only by filing an amended tax return pursuant to § 12-225 (b) (1). According to the commissioner, the trial court had no subject matter jurisdiction because the absence of amended returns represents a failure to exhaust those administrative remedies upon which the waiver of sovereign immunity is predicated.

For this proposition, the commissioner relies on our decision in *Owner-Operators Independent Drivers Assn. of America* v. *State*, supra, 209 Conn. 680, in which the plaintiffs sought to recover taxes paid for fuel identification decals by an independent plenary action without first pursuing statutorily provided

administrative remedies. We concluded in that case that recourse to the available administrative remedies was a prerequisite to the statutory waiver of sovereign immunity and, therefore, to the trial court's jurisdiction, and we affirmed the dismissal by the trial court. Id., 690.

The commissioner's reliance on *Owner-Operators Independent Drivers Assn. of America,* is misplaced for two reasons. First, in the present case, the FDIC's failure to file amended returns did not represent a failure to exhaust the administrative remedies provided by § 12-225 (b) (1) because, as we have explained, the FDIC did not seek tax refunds. Contrary to the commissioner's suggestion, the difference between seeking a refund of taxes voluntarily paid and seeking to regain amounts paid under protest pursuant to a deficiency assessment over and above that payment, is not a "linguistic sleight of hand." Although they both may rest on the same legal theory, the relief sought under each would be different. The administrative procedure provided for by § 12-225 (b) (1) applies only to the former, and not the latter.

Second, unlike the plaintiffs in *Owner-Operators Independent Drivers Assn. of America,* the banks in the present case *did* pursue the available administrative remedies for challenging a deficiency assessment, and the appeals were filed in the trial court pursuant to statute. The banks followed the provisions of § 12-236, and the commissioner does not claim otherwise, albeit they did not raise the intergovernmental theory in those administrative proceedings.[15] Section 12-237 provides for an appeal after "any order, decision, determination

---

[15] The commissioner does not claim, and the trial court did not decide, that the failure of the banks to raise the intergovernmental theory pursuant to § 12-236 deprived the trial court of subject matter jurisdiction over the FDIC's claims. The commissioner claims only, and the trial court solely decided, that the failure of the banks to file amended returns and claims for refunds pursuant to § 12-225 (b) (1) had that effect.

or disallowance of the Commissioner . . . ." The commissioner issued "orders" assessing deficiencies and made "determinations" not to return the protested payments.

The commissioner also argues, in reliance on *Altray Co.* v. *Groppo*, 224 Conn. 426, 440, 619 A.2d 443 (1993), that the "plenary review that the statutes authorize for tax appeals; *Kimberly-Clark Corporation* v. *Dubno*, 204 Conn. 137, 144–45, 527 A.2d 679 (1987); presupposes an underlying administrative determination of fact." Therefore, the commissioner asserts, consideration of the intergovernmental theory "would not have been a de novo review; it would have constituted an initial determination of a tax assessment, the authority for which has been vested by the legislature in the commissioner, not the courts."

It is true that, in *Altray Co.* v. *Groppo*, supra, 224 Conn. 440, in which we reversed the trial court's judgment rejecting the taxpayer's claim for a refund, we noted in framing the remand that the record did not reflect the required administrative factual determination of the amount of the refund claimed, and that, therefore, a "remand to the commissioner is the appropriate course in the absence of such an administrative determination." The tax appeal under § 12-237 in *Altray Co.*, however, was from the commissioner's disallowance of the taxpayer's amended return and claim for refund, pursuant to § 12-225 (b) (1), and in such an administrative proceeding the statute specifically provides that in his disallowance the commissioner shall set forth his "findings of fact and the basis of disallowance . . . ." We already have discussed why, in our view, this proceeding is not governed by § 12-225 (b) (1).

The judgments dismissing the counts in each complaint for lack of subject matter jurisdiction are

reversed and the cases are remanded for further proceedings according to law.

In this opinion the other justices concurred.