[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
CT Page 16051
This action is a tax appeal brought by Ger Oil Company, Inc. ("Ger") challenging the assessment of taxes on Ger's gross earnings on the purchase of petroleum products under the Sale of Petroleum Products Gross Earnings Tax (SOPPGET). The tax is levied quarterly and the dispute in this case covers the period from April 1, 1991 through June 30, 1994.
Ger is a distributor of various petroleum products to gas stations, lube shops and other retailers of goods and services, generally in the automotive industry. Ger purchases products from the manufacturer/producer/refiner and resells them, acting as a "middleman" or distributor. During the audit period, Ger purchased petroleum products from various companies for resale in Connecticut. The two types of purchases made by Ger which are in issue in this appeal are first, purchases made outside of Connecticut, mostly from Valvoline, and second, purchases of petroleum products made from the Kost Group (Kost), which is located in Ohio and delivered the petroleum products to Ger in Connecticut.
Ger claims that the SOPPGET tax should be the burden of Valvoline, since General Statutes § 12-587(b) is intended to tax the first sale of petroleum products in Connecticut by companies engaged in the refining and distributing of those products in Connecticut. Ger also claims that § 12-587(c) is intended to tax the gross earnings of companies which import petroleum products into this state for their use and consumption, including a sale in the regular course of business. Ger argues that it neither refines nor distributes petroleum products in this state and so it is not responsible for the gross earnings tax, which should be Valvoline's responsibility. Ger also argues that the amount of its taxable sales falls below the $100,000 per quarter threshold pursuant to § 12-587(c).
The Commissioner originally determined that all of Ger's purchases of petroleum products were made outside of Connecticut for importation and sale in this state and therefore taxable under General Statutes § CT Page 1605212-587(b). The Commissioner's original determination report showed a total tax due of $91,849.10, plus interest and a penalty. (Defendant's Exhibit 4.) The Commissioner revised his determination during the trial and made a revised assessment of taxes due from Ger pursuant to §12-587(c), rather than under § 12-587(b). The revised determination report showed a total tax due of $63,647.95, plus interest and a penalty. (Defendant's Exhibit 6.) Ger argues that the Commissioner cannot issue a revised assessment more than three years from the date that the tax was due and, and that the new audit determination is not an "order, decision, determination or disallowance of the Commissioner of Revenue Services" from which an appeal can be taken. General Statutes § 12-597.
The Commissioner counters that § 12-600 requires Ger to pay the tax in full as a condition to taking an appeal under § 12-597, and since no tax has been paid by Ger, this appeal should be dismissed. Ger's argument is that § 12-600 only applies to taxpayers who challenge the constitutionality of the provisions of the statute and not to taxpayers who appeal the determination of the Commissioner.
There are three issues in this case:
1. Whether § 12-587(c) was intended to apply to an in-state purchaser of petroleum products such as Ger. If so, how is Ger's tax liability determined?
2. Whether the Commissioner's revision of his determination of taxes due from Ger is an abandonment of his claim for taxes due from Ger.
3. Whether § 12-600 requires a taxpayer to prepay the taxes in issue prior to the commencement of an appeal under § 12-597.
As to the first issue, we must determine whether the legislative intent, in imposing a gross earnings tax on the sale of petroleum products, was to reach the earnings of wholesalers and retailers for marketing and distribution in Connecticut, as well as the earnings of major integrated oil companies who refined and distributed oil for sale in Connecticut.
It is the Commissioner's position that § 12-587(b) imposes a gross earnings tax on companies that sell petroleum oil products to purchasers in this state, and that § 12-587(c) imposes a tax on a purchaser in Connecticut that causes petroleum products to be imported into this state. Thus, the Commissioner considers subsections (b) and (c) of §12-587 to be alternatives to each other, designed to tax either the purchaser or the seller of imported petroleum products. See Revenue Ruling No. 95-5. The Commissioner contends that § 12-587(c) "is intended to CT Page 16053 operate to complement Conn. Gen. Stat. § 12-587(b) in the same way that the use tax complements the sales tax. The use tax complements the sales tax by imposing a tax on purchases made outside of the state or in the state which were not subjected to the sales tax. See Fusco-AmatrudaCo. v. Tax Commissioner, 168 Conn. 597, 362 A.2d 847 (1975). In the same way, Conn. Gen. Stat. § 12-587(c) is intended to tax all purchases of petroleum products not subjected to tax under Conn. Gen. Stat. §12-587(b)." (Defendant's post trial brief, pp. 6-7.)
Ger contends that the gross earnings tax on the sale of petroleum products in this state was meant to tax only the earnings of major integrated oil companies doing business in Connecticut and not the in-state middleman who purchases petroleum products from the major integrated oil companies and sells the products to Connecticut consumers. In support of this contention, Ger points to the legislative comments made by Senator Beck when SOPPGET was first enacted in 1980:
 Mr. President, in order to clarify the intention of this legislation, I would like to cite that we are taxing any petroleum company which is engaged primarily in the refining and distribution of petroleum products and distributes such products to wholesale and retail dealers for marketing and distribution in the state. We are not taxing the dealers who would distribute the product as such, and I would note in line 23, those revenues derived by such company, meaning the petroleum company engaged primarily in refining and distribution from the sale of petroleum products.
23 S. Proc., Pt. 3, 1980 Sess., p. 849. Senator Curry further remarked: "[T]he intent is explicit in the legislation. It is not to be a tax on consumers and we have provided every possible legal safeguard that we could find to deal with a group of people who essentially have almost become outlaws in this country." 23 S. Proc., supra, p. 861.
Consistent with these senators' understanding of the intention of the legislature, Public Act No. 80-71 recited, "[a]ny petroleum company which is engaged primarily in the refining and distribution of petroleum products and distributes such products to wholesale and retail dealers formarketing and distribution in this state shall pay a quarterly tax." (Emphasis added). Public Acts 1980, No. 80-71, § 1. In addition, section 13 of Public Act 80-71 provided: "(a) It is not the intention of the general assembly that the tax imposed under section 1 of this act be construed as a tax upon purchasers of petroleum products, but that such tax shall be levied upon and be collectible from petroleum companies as CT Page 16054 defined in said section 1, and that such tax shall constitute a part of the operating overhead of such companies." Section 13(b) provided that no petroleum company shall raise its posted wholesale rack price in Connecticut higher than it raises wholesale rack prices in all ports on the eastern seaboard of the United States.
From 1980 through 1982, it was clear that the purpose of the petroleum gross earnings tax was to tax the sale of petroleum products brought into Connecticut by the major national oil companies. Some legislators were concerned that this tax upon the major integrated oil companies would be unconstitutional. Senator Post questioned the constitutionality of imposing a tax on "major oil companies." 23 S. Proc., supra, p. 857. This concern was borne out with the decision in Mobil Oil Corp. v. Dubno,492 F. Sup. 1004 (1980), modified, 639 F.2d 919, cert. denied,452 U.S. 967, 101 S.Ct. 3122, 69 L.Ed.2d 980 (1981), in which the court held that section 13(b) of Public Act 80-71 was unconstitutional "in that it is pre-empted by federal law and thus violates the Supremacy Clause." Id., 1015. The basis of the Mobil decision was that the Emergency Petroleum Allocation Act established by Congress, which made an affirmative determination that petroleum products should be free from all price regulation, precluded Connecticut from forbidding integrated petroleum companies from raising wholesale prices charged in Connecticut. Id., 1014.
In 1982, a significant change was made in the wording of General Statutes § 12-587(b). Public Act No. 82-157 changed the language inPublic Act No. 80-71 as follows: "Any [petroleum] company, including forpurposes of this act, any corporation, partnership, limited partnership,association or individual, which is engaged [primarily] in the refining [and] or distribution, or both, of petroleum products and distributes such products [to wholesale and retail dealers for marketing anddistribution] in this state shall pay a quarterly tax."Public Act No. 82-157. The stated purpose of this amendment was reported by Representative Stolberg to be the closing of a loophole in the original act which permitted companies which were not both refiners and distributors, but one or the other to escape the gross earnings tax. 25 H.R. Proc., Pt. 6, 1982 Sess., p. 1929. However, as noted above, this amendment also changed the description of the taxpayer to "[a]ny company, including for purposes of this act, any corporation, partnership, limited partnership, association or individual, which is engaged in the refining or distribution, or both, of petroleum products and distributes such products in this state." The elimination of "petroleum" company, "primarily", and "to wholesale and retail dealers for marketing and distribution in this state" substantially changed the focus of the statute. The tax now applies to any company, partnership, association or individual, not just major oil companies. Pursuant.to the CT Page 16055 1982 amendment, the gross earnings tax applies to all companies, partnerships, associations, or individuals that engage in refining or distribution of petroleum products and distributes these products in the state of Connecticut. General Statutes § 12-587(a), (b). Although individual legislators may have intended that SOPPGET applied only to major integrated oil companies and not to in state companies who distribute petroleum products, we are reminded that in seeking the intent of the legislature, we look at what it said, not at what it meant to say. Sanzone v. Board of Police Commissioners, 219 Conn. 179, 187,592 A.2d 912 (1991).
The distinction between the argument of the Commissioner and Ger is that the Commissioner focuses on the purchaser of the petroleum products as the taxpayer of the gross earnings tax under § 12-587(c), whereas Ger focuses on the original intent of the legislature that only major integrated oil companies were meant to be the taxpayer.
Although we agree with Ger that the original purpose of SOPPGET was to tax the major oil companies in the nation; see Mobil Oil Corp. v. Dubno, supra, 492 F. Sup. 1005-06; the 1982 amendment now appears to reach any corporation, partnership, association, or individual that distributes petroleum products in Connecticut. The only limitation on this tax is that it applies only to the first sale of the product in Connecticut. See General Statutes § 12-587(a)(3) ("`gross earnings' means those earnings derived from the first sale within this state of a petroleum product.") We note Senator Casey's remarks with respect to the proposed 1982 amendment: "This Bill would subject any company engaged in the distribution of petroleum products in the State to the Gross Earnings Tax and apply the tax to the first sale of petroleum product in this State. This legislation closes a loophole." 25 S. Proc., Pt. 6, 1982 Sess., p. 1825.
An analysis of the relationship between subsections (b) and (c) of § 12-587 is necessary for a further consideration of who was the intended taxpayer under SOPPGET. Subsection (b) applies to any company that is engaged is "refining or distribution" of petroleum products and who makes the first sale of the petroleum product in this state. In support of this interpretation of subsection (b), we note that §12-587(b)(2) exempts from the gross earnings tax certain sales of petroleum products. such as: "(A) Any petroleum products sold for exportation from this state for sale or use outside this state. (B) . . . number 2 heating oil, to be used exclusively for heating purposes or to be used in a commercial fishing vessel . . . (C) kerosene. commonly known as number 1 oil, to be used exclusively for heating purposes . . . (D) . . . propane gas, to be used exclusively for heating purposes." It is clear that the gross earnings tax was intended to reach, under § CT Page 1605612-587(b), the sellers of petroleum oil products, either refiners or distributors, not the consumers of petroleum products. This is consistent with the legislative intent that we have previously determined that the gross earnings tax was to be imposed upon the major integrated oil companies and not the home consumers.
Subsection (c) was added to § 12-587 in 1991. Section 12-587(c) applies to any company, whether a petroleum company or not, including corporations, partnerships, associations or individuals, that either imports or causes to be imported petroleum products "for its use and consumption" and which includes "the sale of imported petroleum products in the regular course of business" and is not a company which was subject to and paid the gross earnings tax under § 12-587(b). The exemptions granted to oil companies taxed under § 12-587(b)(2) are also granted to the taxpayer under § 12-587(c). In addition, taxpayers under § 12-587(c) incur no tax obligation until "a quarterly tax on the consideration given or contracted to be given . . . for all such deliveries . . . exceeds one hundred thousand dollars." This amounts to a threshold of $400,000 per year. Section 12-587(b) does not contain the $100,000 per quarter threshold. This certainly shows a legislative intent to treat the taxpayer in § 12-587(b) differently from the taxpayer in § 12-587(c). In addition, § 12-587(b) is couched in the language of "sale" whereas § 12-587(c) is couched in the language of "imports or causes to be imported into this state" It is of no importance to argue, as Ger does, that § 12-599 recites that "(a) It is not the intention of the General Assembly that the tax imposed under § 12-587
be construed as a tax upon the purchasers of petroleum products, but that such tax shall be levied upon and be collectible from petroleum companies as defined in said § 12-587, and that such tax shall constitute a part of the operating overhead of such companies." The description of the companies liable for the tax under § 12-587 was expanded byPublic Act No. 82-157. Section 12-599(a) has remained unchanged since 1980. Therefore, the statement that "such tax shall be levied upon and be collectible from petroleum companies as defined in said section 12-587" now refers to those companies meeting the expanded description in section 12-587 as amended in 1982.
We disagree with the Commissioner's analysis that there is a similarity between a use tax, which is designed to reach sales made out of state, and SOPPGET. The reason we say this is that § 12-587(b) applies to oil companies that are refiners whether in this state or out of state, or companies that distribute into this state without regard to where the petroleum product came from so long as the sale was a first sale in Connecticut. We do agree with the Commissioner that under § 12-587(c) there is a similarity between the use tax and SOPPGET. Under the Connecticut Sales and Use Tax, the ultimate burden to pay the tax is upon CT Page 16057 the purchaser. Sharper Image Corp. v. Miller, 240 Conn. 531, 536,680 A.2d 1297 (1996). Since the burden to pay the gross earnings tax under § 12-587(c) falls upon the purchaser from "first sales of petroleum products within this state," it becomes important, as Ger contends, to determine where title to the petroleum product passes from the seller to the purchaser. See New England Petroleum Corp. v. Groppo,214 Conn. 444, 449-50, 572 A.2d 970 (1990). The reason we say this is that if the petroleum product were purchased out of state, the sale would not come within the statutory designation of "first sale of petroleum products within this state." (Emphasis added.) General Statutes §12-587(a); see Texaco, Inc. v. Groppo, 215 Conn. 134, 139, 574 A.2d 1293
(1990). Since gross earnings provide the basis for taxation under either § 12-587(b) or § 12-587(c), the Commissioner is restricted by § 12-587(a), which defines "gross earnings" as the earnings derived from the "first sale within this state." "First sale" is defined in § 12-587(a)(5): "`first sale of petroleum products within this state' means the initial sale of a petroleum product delivered to a location in this state." According to this definition, "first sale" requires (1) a sale made in Connecticut, and (2) delivery of the petroleum product to Connecticut. The tax is then measured by the consideration given or contracted to be give for the petroleum product sold and delivered in Connecticut. This excludes sales of petroleum products where the sale and/or delivery took place outside of Connecticut.
In summary, we conclude that Ger comes within the definition of a taxpayer under § 12-587(c), and that the first sale made in Connecticut to Ger of petroleum products delivered to Connecticut is subject to the gross earnings tax.
Both Ger and the Commissioner agree that the sales of petroleum products to Ger by the Kost group were the first sales that were made in Connecticut and that the petroleum products were delivered to Ger in Connecticut. Ger is therefore liable for the gross earnings tax on the Kost sales under the conditions set forth in § 12-587(c). As to the sales by Valvoline of petroleum products to Ger, Ger concedes in its post trial brief that Valvoline paid the transportation cost of the petroleum products shipped to Ger in Connecticut during the audit period, and that under these circumstances, the title to the petroleum products was transferred from Valvoline to Ger in Connecticut. (Plaintiff's post trial brief, p. 19.) Under these circumstances, we conclude that Ger is liable for gross earnings tax for the period of April 1, 1991 to June 30, 1994, plus interest. Since the issues in this case have not been previously adjudicated, and require judicial statutory construction, we find no basis for the Commissioner's imposition of a penalty.
The second issue in this case is whether the Commissioner's revision of CT Page 16058 his determination of Ger's tax liability from § 12-587(b) to §12-587(c) is beyond the three year statute of limitations imposed upon the Commissioner by § 12-593. Ger argues that since its appeal of the Commissioner's determination made on August 21, 1997 pursuant to §12-587(b) was taken on September 19, 1997, the Commissioner cannot change the statutory basis for the gross earnings tax under § 12-587(c) because the three year statute of limitation has expired. It is Ger's position that the Commissioner has three years to audit the taxpayer and determine whether there has been an under-payment or non-payment of the tax, and if the Commissioner abandons his original assessment, there is nothing from which to appeal. In other words, Ger claims that it is too late for the Commissioner to charge Ger for underpayment of the gross earnings tax under § 12-587(c). The Commissioner responds that the assessment has only been revised, and that the revision is appropriate in a de novo trial.
In the resolution of this second issue, we are guided by FederalDeposit Ins. Corp. v. Crystal, 251 Conn. 748, 741 A.2d 956 (1999). InFederal Deposit Ins. Corp., the Court, relying on the reasoning inSchlumberger Technology Corp. v. Dubno, 202 Conn. 412, 521 A.2d 569
(1987), and Konover v. West Hartford, 242 Conn. 727, 699 A.2d 158
(1997), considered that in de novo tax appeals, the court's subject matter jurisdiction includes "the power to consider all factors relevant to the determination of the tax liability in question; and (2) that consideration is independent of the action or decision at the administrative tribunal." Federal Deposit Ins. Corp. v. Crystal, supra,251 Conn. 763. In this case, the Commissioner's determination arose from an audit of Ger's tax liability under the gross earnings tax section of § 12-587. Whether the assessment arose under § 12-587(b) or § 12-587(c), the issue of the tax liability of Ger under SOPPGET remains the same in this de novo tax appeal. Ger is liable for gross earnings tax in the amount stated in the revised determination report of $63,647.95, plus interest. (Defendant's Exhibit 6.)
The third and last issue in this case is whether Ger was required to pre-pay the tax as determined by the Commissioner prior to taking this appeal. The Commissioner relies on General Statutes § 12-600, which provides: "Any taxes, penalties or interest due from any company under the provisions of §§ 12-587 to 12-602, inclusive, shall be paid in full before any action may be instituted in any state court to challenge all or any part of the provisions of said sections. No injunction or restraining order shall be issued by any state court to stay or prevent the imposition or collection of taxes as provided under said sections." Ger points out that whereas § 12-600 refers to a "challenge" to "all or any part of the provisions of said sections," § 12-597 refers to the taking an appeal from the determination or disallowance by the CT Page 16059 Commissioner, not a challenge to the provisions of the statutes.
Section 12-597 recites, in relevant part: "Any taxpayer aggrieved because of any order, decision, determination or disallowance of the Commissioner of Revenue Services made in relation to the tax imposed under § 12-587 may, within one month after service upon the taxpayer of notice of such order, decision, determination or disallowance, take an appeal therefrom to the superior court." Section 12-597 provides for appeals from the Commissioner's "decision, determination or disallowance made in relation to the tax imposed under § 12-587. Section 12-600
provides for prepayment of the tax before any action may be brought in state court to "challenge all or any part of the provisions" of §§12-587 to 12-602. Section 12-600 also provides that a state court shall not issue any injunction or restraining orders to stay or prevent the imposition or collection of taxes. This Language is not common to tax appeals as such.
We have reviewed the legislative history of § 12-587 and the original intent to impose a gross earnings tax on major integrated oil companies. We also knew of the concern of the legislature, at that time, of constitutional challenges to this tax by the major integrated oil companies, and the desire to avoid those challenges. We have also discussed Mobil Oil Corp. v. Dubno, supra, 492 F. Sup. 1004, as an example of a challenge to the constitutionality of this tax. We agree with Ger that in this case it is not challenging the provisions of the gross earnings tax but rather appealing an adverse determination by the Commissioner. Section 12-600 was intended to govern situations where the constitutional authority of the legislature to enact a gross earnings tax was challenged. We therefore find that Ger was not required to prepay the tax prior to taking this' appeal.
Accordingly, for all of the foregoing reasons, we find that Ger is liable for gross earnings tax in the amount of $63,647.95, plus interest. We sustain the appeal by Ger only as to the imposition of the penalty, which we find not to apply in this case. This judgment shall enter without costs to either party.
Arnold W. Aronson Judge Trial Referee