******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JEFFERSON ALLEN ET AL. *v.* COMMISSIONER
OF REVENUE SERVICES
(SC 19567)

Palmer, Zarella, Eveleigh, McDonald and Robinson, Js.

*Argued October 13—officially released December 28, 2016\**

*Daniel J. Krisch*, with whom was *Leslie E. Grodd*, for the appellants (plaintiffs).

*Patrick T. Ring*, assistant attorney general, with whom were *Matthew J. Budzik*, assistant attorney general, and, on the brief, *George Jepsen*, attorney general, for the appellee (defendant).

*Opinion*

EVELEIGH, J. The plaintiffs, Jefferson Allen and Evita Allen, appeal[1] from the trial court's award of summary judgment upholding the decision of the defendant, the Commissioner of Revenue Services, denying their request for a tax refund for the taxable years 2002, 2006, and 2007. In this appeal, the plaintiffs claim that the trial court improperly concluded that: (1) it lacked subject matter jurisdiction with respect to the plaintiffs' claim for a refund for the taxable year 2002 on the basis of the three year limitation period to file an income tax refund pursuant to General Statutes § 12-732 (a); (2) § 12-711(b)-18 of the Regulations of Connecticut State Agencies permitted the defendant to tax the plaintiffs' income derived from the exercise of options because the options were granted as compensation for performing services within the state; and (3) it is constitutional to impose a tax on income derived from the exercise of nonqualified stock options[2] by a nonresident who was granted the options as compensation for performing services within the state. We disagree with each of the plaintiffs claims. Because the form of the trial court's judgment with respect to the plaintiffs' claim relating to the taxable year 2002 was improper, we reverse the trial court's award of summary judgment with respect to that taxable year and remand the case with direction to render judgment dismissing that claim. We affirm the judgment of the trial court in all other respects.

The following undisputed facts and procedural history are relevant to this appeal. From 1990 to 2001, Jefferson Allen[3] served as president and chief financial officer of Tosco, Inc. (Tosco). During this period, Allen was domiciled in and performed services solely within Connecticut. As part of his compensation while employed with Tosco, he was awarded nonqualified stock options.[4] In 2002, while the plaintiffs were residing outside of Connecticut, Allen exercised the options he was granted by Tosco, resulting in $7,633,027 of income. The plaintiffs filed a Connecticut nonresident and part year resident income tax return reporting income from exercising these options in 2002 and paid the applicable tax.

After a period of nonresidency from 2002 to 2004, the plaintiffs returned to Connecticut in 2005. From January 1, 2005 to August 31, 2005, Allen served as the chief executive officer of Premcor, Inc. (Premcor), and performed services solely within Connecticut. As part of his compensation for performing services for Premcor, Allen was awarded nonqualified stock options.[5] The plaintiffs again moved out of Connecticut and resided outside the state in 2006 and 2007. In 2006, Allen exercised certain stock options he had earned performing services for Premcor, resulting in $43,360,812 of income. In 2007, Allen again exercised

certain stock options that were earned as compensation for performing services for Premcor, resulting in $2,247,745 of income. The plaintiffs timely filed their tax returns and paid the applicable tax for the taxable years 2007 and 2008.

In October, 2009, the plaintiffs filed amended returns for the taxable years 2002, 2006, and 2007, claiming refunds for the income tax that the plaintiffs had paid in each of those years. The plaintiffs' claims for a refund were denied. In 2013, the Appellate Division of the Department of Revenue Services affirmed the denial. The defendant thereafter issued a final determination denying the plaintiffs' claims for refunds.

Pursuant to General Statutes § 12-730,[6] the plaintiffs timely filed an appeal from the defendant's determination in the Superior Court. The parties filed cross motions for summary judgment on stipulated facts, which the trial court granted in favor of the defendant. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

First we address the issue of whether the trial court properly concluded that it lacked subject matter jurisdiction regarding the plaintiffs' claim for a refund for the taxable year 2002 because they filed their claim after the lapse of the three year statute of limitations for such a claim pursuant to § 12-732 (a) (1). The plaintiffs concede that their request for a refund was filed after the lapse of the three year period.[7] Nevertheless, relying principally upon *Williams* v. *Commission on Human Rights & Opportunities*, 257 Conn. 258, 777 A.2d 645 (2001), the plaintiffs argue that the three year statute of limitations is not jurisdictional and, therefore, should be equitably tolled. In response, the defendant claims that the statute of limitations, because it forms part of a statutory scheme that waives sovereign immunity, is jurisdictional and should not be tolled. We agree with the defendant.

The following additional facts and procedural history are relevant to the resolution of this issue. The defendant commenced an audit of the plaintiffs' taxable year 2005 income tax return in July 2006. In March 2007, the defendant expanded the audit to include the taxable years 2001 through 2004. Around this same time, the plaintiffs filed a Connecticut nonresident and part year resident return reporting income from 2002 and paid the applicable tax. In October 2009, the plaintiffs filed amended returns for the taxable year 2002, claiming a refund for the income tax that the plaintiffs had paid. In October, 2012, the plaintiffs claim for a refund for the taxable year 2002 was disallowed. The defendant denied the request for a refund on the grounds that, pursuant to § 12-732 (a) (1),[8] the claim for a refund was untimely. The trial court affirmed the determination of

the defendant, concluding that it lacked subject matter jurisdiction to consider the plaintiffs' claim.

Our standard of review with respect to a trial court determination regarding subject matter jurisdiction is well settled. "A determination regarding a trial court's subject matter jurisdiction is a question of law. When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Citibank, N.A.* v. *Lindland*, 310 Conn. 147, 161, 75 A.3d 651 (2013).

"The principle that the state cannot be sued without its consent, or sovereign immunity, is well established under our case law. . . . It has deep roots in this state and our legal system in general, finding its origin in ancient common law. . . . Not only have we recognized the state's immunity as an entity, but [w]e have also recognized that because the state can act only through its officers and agents, a suit against a state officer concerning a matter in which the officer represents the state is, in effect, against the state." (Internal quotation marks omitted.) *DaimlerChrysler Corp.* v. *Law*, 284 Conn. 701, 711, 937 A.2d 675 (2007). The principle of sovereign immunity implicates the subject matter jurisdiction of the court. Id.; see also *Giannoni* v. *Commissioner of Transportation*, 322 Conn. 344, 349, 141 A.3d 784 (2016) ("sovereign immunity implicates [a court's] subject matter jurisdiction" [internal quotation marks omitted]); *Chief Information Officer* v. *Computers Plus Center, Inc.*, 310 Conn. 60, 79, 74 A.3d 1242 (2013) (same); *Nelson* v. *Dettmer*, 305 Conn. 654, 660, 46 A.3d 916 (2012) (same); *Miller* v. *Egan*, 265 Conn. 301, 313, 828 A.2d 549 (2003) (same).[9]

The principles governing statutory waivers of sovereign immunity are well established. "[A] litigant that seeks to overcome the presumption of sovereign immunity [pursuant to a statutory waiver] must show that . . . the legislature, either expressly or by force of a necessary implication, statutorily waived the state's sovereign immunity . . . . In making this determination, [a court shall be guided by] the well established principle that statutes in derogation of sovereign immunity should be strictly construed. . . . [When] there is any doubt about their meaning or intent they are given the effect which makes the least rather than the most change in sovereign immunity. . . . Furthermore, because such statutes are in derogation of the common law, [a]ny statutory waiver of immunity must be narrowly construed . . . and its scope must be confined strictly to the extent the statute provides." (Citation omitted; internal quotation marks omitted.) *Housatonic Railroad Co.* v. *Commissioner of Revenue Services*, 301 Conn. 268, 288–89, 21 A.3d 759 (2011). "Whether the legislature has waived the state's sovereign immunity

raises a question of statutory interpretation." Id. As such, we are guided by the principles of General Statutes § 1-2z.

A tax appeal is a two step process. With respect to a claim for a refund for income taxes, the plaintiff must first timely file a claim with the defendant. General Statutes § 12-732 (a) (1); see *Federal Deposit Ins. Corp.* v. *Crystal*, 251 Conn. 748, 759, 741 A.2d 956 (1999). Section 12-732 (a) (1), in establishing an administrative claim for a refund, is not itself an express or implicit waiver of sovereign immunity. See *DaimlerChrysler Corp.* v. *Law*, supra, 284 Conn. 715 (noting that sales and use tax refund statute, General Statutes § 12-425 is not waiver of sovereign immunity). The applicable appeal statute, § 12-730, does, however, statutorily waive sovereign immunity. Id. Compliance with the refund statute is a condition precedent to availing oneself of the limited statutory waiver of sovereign immunity provided by the appeal statute. See *Federal Deposit Ins. Corp.* v. *Crystal*, supra, 760 (noting that corporate tax refund statute "establishes an administrative request for a refund as the prescribed avenue of relief that the [plaintiff was] required to follow in order to take advantage of the state's limited waiver of its sovereign immunity" [internal quotation marks omitted]).

Our firmly rooted principles of sovereign immunity demand strict compliance with the procedures set forth in the relevant statutes. In determining the scope of the statutory waiver of sovereign immunity, we are mindful that the underlying refund claim may impose "a monetary obligation on the sovereign, and thus it is essential for its requirements to be satisfied." (Internal quotation marks omitted.) *Housatonic Railroad Co.* v. *Commissioner of Revenue Services*, supra, 301 Conn. 289, quoting *DaimlerChrysler Corp.* v. *Law*, supra, 284 Conn. 716. In *DaimlerChrysler Corp.*, we reasoned that the plaintiff had failed to fall within the ambit of the relevant appeal statute because, inter alia, the plaintiff invoked the relevant sales and use refund statute, § 12-425, "independent of the statutory prerequisites for its application . . . and without the ability to satisfy those prerequisites." *DaimlerChrysler Corp.* v. *Law*, supra, 716–17.[10] Accordingly, the plaintiff in that case did "not fall within the class of persons entitled to a refund pursuant to § 12-425 for whom the legislature waived sovereign immunity." Id., 717.

We have also addressed this issue in the context of corporate taxes in *Federal Deposit Ins. Corp.* v. *Crystal*, supra, 251 Conn. 759–60. In that case, we staed: "There is no question . . . that if [the plaintiff] were seeking . . . a refund of . . . corporation business taxes that the banks[11] had allegedly overpaid for the years in question . . . failure to follow the procedures set forth in [General Statutes] § 12-225 (b) (1)[12] would deprive the court of subject matter jurisdiction over such a claim."

(Footnotes added.) Id., 759. We noted that the statute "establishes an administrative request for a refund as the prescribed avenue of relief that the [plaintiff was] required to follow in order to take advantage of the state's limited waiver of its sovereign immunity." Id., 750. "We have frequently held that where a statute has established a procedure to redress a particular wrong a person must follow the specified remedy and may not institute a proceeding that might have been permissible in the absence of such a statutory procedure. *Norwich* v. *Lebanon*, 200 Conn. 697, 708, 513 A.2d 77 (1986). When an adequate administrative remedy exists at law, a litigant must exhaust it before the Superior Court will obtain jurisdiction over an independent action on the matter. . . . *Owner-Operators Independent Drivers Assn. of America* v. *State*, 209 Conn. 679, 686–87, 553 A.2d 1104 (1989). Thus, intertwined principles of sovereign immunity and exhaustion of administrative remedies would require that any claim for a refund of taxes allegedly overpaid . . . be preceded by a timely amended return and claim for such a refund pursuant to § 12-225. Id., 686." (Internal quotation marks omitted.) *Federal Deposit Ins. Corp.* v. *Crystal*, supra, 760. While the statute discussed in *Federal Deposit Ins. Corp.* v. *Crystal*, supra, 760, § 12-225 (b) (1), implicated corporate taxes, both §§ 12-225 (b) (1) and 12-732 (a) (1) permit claims for refunds within only a prescribed three year period. In addition, both statutes provide that "[f]ailure to file a claim within the time prescribed in this section constitutes a waiver of any demand against the state on account of overpayment." General Statutes §§ 12-225 (b) (1) and 12-732 (a) (1).

In short, the refund statute and the appeal statute set forth precise procedures a taxpayer must follow in order to invoke the jurisdiction of the trial court to review their claim.[13] In the present case, the plaintiffs failed to comply with the requirements of § 12-732 (a) (1). Because the plaintiffs failed to comply with the statutory prerequisites for their administrative refund claim for the 2002 taxable year, the trial court was without subject matter jurisdiction to consider that claim.

II

We next address the plaintiffs' claims with respect to taxable years 2006 and 2007. The plaintiffs claim that the income derived from the exercise of the Premcor options by Allen in 2006 and 2007 is not properly taxable under § 12-711(b)-18 (a) of the regulations. Specifically, the plaintiffs claim that § 12-711(b)-18 (a) requires a taxpayer to be performing services in Connecticut at the time of exercising the options, as well as at the time the options were awarded, in order for the income derived therefrom to be subject to taxation. The defendant contends that § 12-711(b)-18 (a) requires only that the taxpayer have been performing services in Connect-

icut at the time the options were granted. The plaintiffs further claim that taxation of the income derived from the exercise of the Premcor options violates the due process clause of the federal constitution. We disagree with the plaintiffs.

The following additional facts and procedural history are relevant to the resolution of these issues. In October 2009, the plaintiffs filed amended returns for the taxable years 2006 and 2007, claiming refunds for the income tax that the plaintiffs had paid for both of those years. The defendant denied the plaintiffs' claims for a refund for taxable years 2006 and 2007 on the grounds that the Premcor options were granted as compensation for services Allen performed in Connecticut and, therefore, the income was properly reported as income from Connecticut sources. In 2013, the Appellate Division of the Department of Revenue Services affirmed the denial. The defendant thereafter issued a final determination denying the plaintiffs' claims for refunds. The plaintiffs timely appealed to the trial court, which affirmed the decision of the defendant and rejected the plaintiffs' constitutional claim.

A

Our resolution of this issue first requires a discussion of the legal framework applicable to the state and federal taxation of nonqualified stock options. General Statutes § 12-700 (b) authorizes the taxation of income "derived from or connected with sources within this state of each nonresident . . . ." The tax upon nonresidents is determined by the application of a formula that includes the nonresident's "Connecticut adjusted gross income derived from or connected with sources within this state . . . ." General Statutes § 12-700 (b). While the terms "adjusted gross income" and "Connecticut adjusted gross income" are defined by statute; see General Statutes § 12-701 (a) (19) and (20);[14] the legislature delegated to the defendant ability to define the term " 'derived from or connected with sources within this state' . . . ." General Statutes § 12-701 (c). Pursuant to this statutory authority, the defendant has promulgated a regulation that addresses nonqualified stock options that provides in relevant part as follows: "Connecticut adjusted gross income derived from or connected with sources within this state includes . . . income recognized under section 83 of the Internal Revenue Code in connection with a nonqualified stock option if, during the period beginning with the first day of the taxable year of the optionee during which such option was granted and ending with the last day of the taxable year of the optionee during which such option was exercised (or, if the option has a readily ascertainable fair market value, as defined in 26 C.F.R. § 1.83-7[b], at the time of grant, the taxable year during which such option was granted), the optionee was performing services within Connecticut . . . ." Regs., Conn. State

Agencies § 12-711(b)-18 (a).

Because § 12-711(b)-18 of the regulations incorporates § 83 of the Internal Revenue Code, we look to federal law for further guidance on the taxation of non-qualified stock options.[15] Under the federal law, the transfer of property in exchange for the performance of services is generally subject to taxation. See 26 U.S.C. § 83 (a). Not all transfers of property in exchange for the performance of services are taxable events at the time of transfer. One such transfer is the transfer of stock options without a readily ascertainable fair market value. 26 U.S.C. § 83 (e) (3); see *Commissioner of Internal Revenue* v. *LoBue*, 351 U.S. 243, 249, 76 S. Ct. 800, 100 L. Ed. 1142 (1956). This, however, is by no means a tax shelter. Taxation is merely deferred until the taxpayer exercises the option. 26 C.F.R. § 1.83-7 (a).[16] Indeed, "the uniform Treasury practice since 1923 has been to measure the compensation to employees given stock options subject to contingencies of this sort by the difference between the option price and the market value of the shares at the time the option is exercised." *Commissioner of Internal Revenue* v. *LoBue*, supra, 249. "[E]ver since *LoBue* it has been unquestioned that, except for statutory alleviation, when a compensatory option has no ascertainable market value as of the time of grant, the receipt of fruits of the option when exercised, fixes the time and measures the value of the economic benefit intended to be, and now, conferred upon the employee." *Rank* v. *United States*, 345 F.2d 337, 343 (5th Cir. 1965); see also *Sutardja* v. *United States*, 109 Fed. Cl. 358, 363 (2013) ("[T]he Supreme Court established half a century ago that, absent certain circumstances, the mere grant of employee stock options is not a taxable event. . . . A taxable event occurs only when the option is exercised, resulting in a sale of shares to the employee, the net value of which is immediately taxable." [Citations omitted.]).

B

With that background in mind, we now address the proper construction of § 12-711(b)-18 (a) of the regulations. The plaintiffs claim that § 12-711(b)-18 (a) requires a taxpayer to be performing services in Connecticut at the time of exercising the options, as well as at the time the options were awarded, in order for the income derived therefrom to be subject to taxation. The defendant contends that § 12-711(b)-18 (a) requires only that the taxpayer have been performing services in Connecticut at the time the options were granted. We agree with the defendant.

"Administrative regulations have the 'full force and effect' of statutory law and are interpreted using the same process as statutory construction . . . ." (Internal quotation marks omitted.) *Sarrazin* v. *Coastal, Inc.*, 311 Conn. 581, 603, 89 A.3d 841 (2014); see also *Alexan-*

*dre* v. *Commissioner of Revenue Services*, 300 Conn. 566, 578, 22 A.3d 518 (2011); *Hasychak* v. *Zoning Board of Appeals*, 296 Conn. 434, 443, 994 A.2d 1270 (2010). Accordingly, "[i]n conducting this analysis, we are guided by the well established principle that [i]ssues of statutory construction raise questions of law, over which we exercise plenary review. . . . We are also guided by the plain meaning rule for statutory construction. See General Statutes § 1-2z." (Internal quotation marks omitted.) *LaFrance* v. *Lodmell*, 322 Conn. 828, 833–34, 144 A.3d 373 (2016).

"When construing a statute, [the court's] fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, [the court] seek[s] to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning . . . § 1-2z directs [the court] first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Citation omitted; internal quotation marks omitted.) *Price* v. *Independent Party of CT—State Central*, 323 Conn. 529, 539–40, 147 A.3d 529 (2016).

The starting point in the analysis is the language of § 12-711(b)-18 (a) of the regulations itself, which is set forth in part II A of this opinion. The plaintiffs claim that ambiguity lies in the meaning of the word "during," as used in § 12-711(b)-18 (a) of the regulations. Because that term is not defined by regulation or statute, we look to the dictionary for guidance. General Statutes § 1-1 (a). "[D]uring" is defined as both "throughout the continuance or course of" and "at some point in the course of . . . ." Webster's Third New International Dictionary (1961). By applying the first definition, § 12-711(b)-18 (a) of the regulations would subject option income to taxation only if the taxpayer had been performing services in the state throughout the period in which the options were granted and subsequently exercised. By applying the second definition, § 12-711(b)-18 (a) of the regulations would require that the nonresident taxpayer only have been performing services in the state at the time the options were awarded. The parties disagree as to which definition of "during" is proper. As we have repeatedly noted, however, statutory language "does not become ambiguous merely because the parties contend for different meanings." (Internal quotation marks omitted.) *Glastonbury Co.* v. *Gillies*, 209 Conn. 175, 180, 550 A.2d 8 (1988); see also *Luttrell* v.

*Luttrell*, 184 Conn. 307, 310–11, 439 A.2d 981 (1981); *Caldor, Inc.* v. *Heffernan*, 183 Conn. 566, 571, 440 A.2d 767 (1981). We conclude that § 12-711(b)-18 (a) of the regulations is unambiguous because application of the second definition of "during" leads to the only reasonable construction. See *Planning & Zoning Commission* v. *Freedom of Information Commission*, 316 Conn. 1, 12–13, 110 A.3d 419 (2015) ("it is a basic tenet of statutory construction that [w]e construe a statute as a whole and read its subsections concurrently in order to reach a reasonable overall interpretation" [internal quotation marks omitted]).[17]

Reading the term "during" in § 12-711(b)-18 (a) of the regulations to mean "throughout the continuance or course of"; Webster's Third New International Dictionary, supra; is unreasonable for two reasons. First, this definition of "during" would create disharmony within the regulation itself. It is axiomatic that the legislature is presumed to have enacted a consistent and harmonious body of law. See *LaFrance* v. *Lodmell*, supra, 322 Conn. 837. It is a "cardinal" maxim of statutory interpretation "that statutes shall not be construed to render any sentence, clause, or phrase superfluous or meaningless." (Internal quotation marks omitted.) *Commissioner of Public Safety* v. *Freedom of Information Commission*, 312 Conn. 513, 543, 93 A.3d 1142 (2014); *Connecticut Podiatric Medical Assn.* v. *Health Net of Connecticut, Inc.*, 302 Conn. 464, 474, 28 A.3d 958 (2011) ("[I]t is a basic tenet of statutory construction that the legislature [does] not intend to enact meaningless provisions. . . . [I]n construing statutes, we presume that there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous." [Internal quotation marks omitted.]).

Subsection (a) of § 12-711(b)-18 of the regulations defines the income derived from stock options as includable in Connecticut adjusted gross income, subject to certain conditions. This subsection contains proviso language, "to the extent provided in this section," which indicates that other parts of the regulation further delineate how much of the income is includable in Connecticut adjusted gross income. Subsection (b) of § 12-711(b)-18 requires the application of a formula to determine how much income is includable in Connecticut gross income for nonresident taxpayers who perform services wholly within Connecticut. Subsection (c) of § 12-711(b)-18 requires the application of a different formula to determine how much income is includable in Connecticut gross income for nonresident taxpayers who perform services partly within and partly without the state of Connecticut.[18] If subsection (a) were construed to require the taxpayer to be performing services within Connecticut throughout the course of the relevant time period, then the option income of a taxpayer who performs services partially within and partially

without Connecticut would, by definition, not be includable in Connecticut adjusted income. Consequently, the formula set forth in subsection (c) to be applied to such a taxpayer would be superfluous because such taxpayer's option income would not be includable in gross income pursuant to subsection (a). Likewise, under the plaintiffs' construction, there would be no need to distinguish between taxpayers performing services wholly in Connecticut and taxpayers performing services partially within and partially without Connecticut because the option income of the latter would not be includable in Connecticut adjusted gross income pursuant to subsection (a).

Second, the plaintiffs' proposed construction of the relevant regulation would lead to bizarre results. It is well established that "those who promulgate statutes . . . do not intend . . . absurd consequences or bizarre results." (Internal quotation marks omitted.) *State* v. *Courchesne*, 296 Conn. 622, 710, 998 A.2d 1 (2010). According to the plaintiffs' proposed construction, option income is includable in Connecticut adjusted gross income only if the optionee was performing services within Connecticut throughout the course of "the period beginning with the first day of the taxable year of the optionee during which such option was granted and ending with the last day of the taxable year of the optionee during which such option was exercised . . . ." Regs., Conn. State Agencies § 12-711(b)-18 (a). The practical consequence of this construction is that a taxpayer may commence performing services after the first day of the taxable year in which the options are granted or cease performing services before the last day of the taxable year in which the options are exercised in order to escape taxation of the option income. By way of example, if a taxpayer commences performing services in Connecticut on February 1, is awarded options on June 30, exercises the options on March 1 of the following year, and continues employment thereafter, the income would not be includable in Connecticut adjusted gross income because the taxpayer was not performing services in Connecticut during January, the first month of the taxable year in which the options were granted. Other similar examples could be envisaged. In addition, this construction is without a limiting principle. A taxpayer who takes one month of leave could claim that he was not performing services "throughout the continuance or course of" the relevant period. Perhaps a similar claim could be made for a week of leave, or even a day. This construction of the regulation is unreasonable and does not give effect to the intention of the defendant in promulgating the regulation.

Application of the second definition of "during," i.e., "at some point in the course of," furnishes a reasonable construction of the regulatory language at issue. Under this construction, if at any point during the taxable year

in which the options were granted and the taxable year in which the options were exercised the taxpayer were performing services in Connecticut, the income derived from the exercise of the options would be includable in Connecticut adjusted gross income. In turn, subsections (b) and (c) of § 12-711(b)-18 of the regulations set forth the extent to which the income is includable in Connecticut adjusted gross income on the basis of whether the services were performed wholly or partially within Connecticut. This construction imposes no irrational or arbitrary conditions upon the taxation of option income and comports comfortably with the due process principle that a state may tax the compensation of nonresidents who perform services within the taxing state. See part II C of this opinion.

The plaintiffs' claim that the defendant's construction of the regulation would result in absurd results because a nonresident would be taxed upon the exercise of stock options but "income distributed from a pension or retirement plan to nonresidents" would not be subject to taxation. Regs., Conn. State Agencies § 12-711(b)-12. This is absurd, the plaintiffs claim, because while both forms of income are earned while performing services in the state, only the former is subject to taxation. We disagree that this is an absurd result. First, we note that federal law prohibits state taxation of a nonresident's retirement income. See 4 U.S.C. § 114 (a).[19] Second, it is well established that "[a] [s]tate may divide different kinds of property into classes and assign to each class a different tax burden so long as those divisions and burdens are reasonable." *Allegheny Pittsburgh Coal Co.* v. *County Commission*, 488 U.S. 336, 344, 109 S. Ct. 633, 102 L. Ed. 2d 688 (1989); cf. *Allied Stores of Ohio, Inc.* v. *Bowers*, 358 U.S. 522, 526–27, 79 S. Ct. 437, 3 L. Ed. 2d 480 (1959) ("The [s]tate may impose different specific taxes upon different trades and professions and may vary the rate of excise upon various products. It is not required to resort to close distinctions or to maintain a precise, scientific uniformity with reference to composition, use or value."). This disparate treatment of two different forms of income reflects the policy judgment that the defendant may exercise pursuant to the authority vested in it by the legislature.

Allen was performing services solely within Connecticut when he earned the Premcor options in 2005. Accordingly, we conclude that the income derived from the exercise of the Premcor options by Allen in 2006 and 2007 is properly taxable under § 12-711(b)-18 (a) of the regulations.

C

We next address whether the trial court properly concluded that the taxation of the income derived from Allen's exercise of the Premcor options in 2006 and 2007 while a nonresident of Connecticut violated the

due process clause of the federal constitution. The plaintiffs claim that taxation of income derived from the exercise of stock options by a nonresident violates the due process clause because the options had no readily ascertainable value when they were granted and there was an insufficient nexus between Connecticut and the value attributable to the options at the time of exercise. The defendant claims that the fact that Allen was granted the stock options as compensation for performing services in Connecticut serves as a sufficient nexus to the state to satisfy the requirements of the due process clause. We agree with the defendant.

In this appeal challenging the constitutionality of a regulation, we apply the same standard of review for challenges to the constitutionality of a statute. "Determining the constitutionality of a statute presents a question of law over which our review is plenary. . . . It [also] is well established that a validly enacted statute carries with it a strong presumption of constitutionality, [and that] those who challenge its constitutionality must sustain the heavy burden of proving its unconstitutionality beyond a reasonable doubt. . . . The court will indulge in every presumption in favor of the statute's constitutionality . . . . Therefore, [w]hen a question of constitutionality is raised, courts must approach it with caution, examine it with care, and sustain the legislation unless its invalidity is clear." (Internal quotation marks omitted.) *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 405, 119 A.3d 462 (2015).

The power of Connecticut to impose a tax is a firmly rooted inherent sovereign power. See *Shaffer* v. *Carter*, 252 U.S. 37, 51, 40 S. Ct. 221, 64 L. Ed. 445 (1920) ("[t]he rights of the several [s]tates to exercise the widest liberty with respect to the imposition of internal taxes always has been recognized in the decisions of [the Supreme Court of the United States]"); *M'Culloch* v. *Maryland*, 17 U.S. (4 Wheat.) 316, 429, 4 L. Ed. 579 (1819) ("It is obvious, that it is an incident of sovereignty, and is co-extensive with that to which it is an incident. All subjects over which the sovereign power of a [s]tate extends, are objects of taxation . . . ."). This sovereign power, however, is not unbounded. The due process clause of the fourteenth amendment to the United States constitution[20] places a limit upon Connecticut's power to impose a tax.[21] "A state is free to pursue its own fiscal policies, unembarrassed by the [c]onstitution, if by the practical operation of a tax the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society." (Internal quotation marks omitted.) *Chase Manhattan Bank* v. *Gavin*, 249 Conn. 172, 184, 733 A.2d 782, cert. denied, 528 U.S. 965, 120 S. Ct. 401, 145 L. Ed. 2d 312 (1999), quoting *Wisconsin* v. *J. C. Penney Co.*, 311 U.S. 435, 444, 61 S. Ct. 246, 85

L. Ed. 267 (1940).

"[T]he due process clause denies to the state power to tax or regulate the [entity's] property and activities elsewhere." *Connecticut General Life Ins. Co.* v. *Johnson*, 303 U.S. 77, 80–81, 58 S. Ct. 436, 82 L. Ed. 673 (1938). In order to determine whether a state tax comports with the constraints of the due process clause, a reviewing court shall examine "whether the taxing power exerted by the state bears a fiscal relation to protection, opportunities and benefits given by the state. The simple but controlling question is whether the state has given anything for which it can ask return." (Internal quotation marks omitted.) *Chase Manhattan Bank* v. *Gavin*, supra, 249 Conn. 184.

The standard has been refined to a two part test. "The [d]ue [p]rocess [c]lause demands that [1] there exist some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax, as well as [2] a rational relationship between the tax and the values connected with the taxing [s]tate." (Internal quotation marks omitted.) *MeadWestvaco Corp.* v. *Illinois Dept. of Revenue*, 553 U.S. 16, 24, 128 S. Ct. 1498, 170 L. Ed. 2d 404 (2008); see also *Quill Corp.* v. *North Dakota*, 504 U.S. 298, 306, 112 S. Ct. 1904, 119 L. Ed. 2d 91 (1992); *Mobil Oil Corp.* v. *Commissioner of Taxes*, 445 U.S. 425, 436–37, 100 S. Ct. 1223, 63 L. Ed. 2d 510 (1980); *Moorman Mfg. Co.* v. *Bair*, 437 U.S. 267, 272–73, 98 S. Ct. 2340, 57 L. Ed. 2d 197 (1978).

The first prong of the test, the minimum connection requirement, may be satisfied in a number of circumstances. "It is well established that a state may tax all of the income of one of its domiciliaries, irrespective of the source of that income, geographical or otherwise." *Chase Manhattan Bank* v. *Gavin*, supra, 249 Conn. 188, citing *Oklahoma Tax Commission* v. *Chickasaw Nation*, 515 U.S. 450, 462–63, 115 S. Ct. 2214, 132 L. Ed. 2d 400 (1995). It is equally well established that a state may tax the income of nonresidents earned within the taxing state. See *Shaffer* v. *Carter*, supra, 252 U.S. 52 ("just as a [s]tate may impose general income taxes upon its own citizens and residents whose persons are subject to its control, it may, as a necessary consequence, levy a duty of like character, and not more onerous in its effect, upon incomes accruing to [nonresidents] from their property or business within the [s]tate, or their occupations carried on therein; enforcing payment, so far as it can, by the exercise of a just control over persons and property within its borders"); see also *Zelinsky* v. *Tax Appeals Tribunal*, 1 N.Y.3d 85, 97, 801 N.E.2d 840, 769 N.Y.S.2d 464 (2003) (concluding that Connecticut resident "clearly has a 'minimum connection' to New York by virtue of his employment" at New York law school). Additionally, as we have previously noted, the United States Supreme Court has incorpo-

rated principles from its judicial jurisdiction line of cases into the "minimum connection" analysis by rejecting the formalistic test of taxpayer " 'presence' " in the jurisdiction and analyzing whether the taxpayer's contacts with the state make the exercise of jurisdiction reasonable. See *Chase Manhattan Bank* v. *Gavin*, supra, 186–87 (discussing *Quill* v. *North Dakota*, supra, 504 U.S. 306–308).[22]

With respect to the second prong of the test, a rational relationship between the tax and the values connected with the taxing state, "its principal application has been in cases in which a state seeks to attribute to its tax base some portion of the property or income of a multistate business enterprise that does business in the state. In such cases, the 'values' to which the test refers are numerical, economic or fiscal values—property values in a broad sense; not values in a social science sense—and the cases require, in general terms, that only a fair proportion of the property or income of the total enterprise be attributed to the taxing state. See, e.g., *Mobil Oil Corp.* v. *Commissioner of Taxes of Vermont*, supra, 445 U.S. 425; *Moorman Mfg. Co.* v. *Bair*, supra, 437 U.S. 267; *Norfolk & Western* [*Railway*] *Co.* v. *Missouri Tax Commission*, [390 U.S. 317, 88 S. Ct. 995, 19 L. Ed. 2d 1201 (1968)]." *Chase Manhattan Bank* v. *Gavin*, supra, 249 Conn. 185 n.14.

We conclude that taxation of the income derived from Allen's exercise of the Premcor options comports with the due process clause of the federal constitution. The jurisdictional fact that Allen earned the stock options while performing services in Connecticut serves, for purposes of the due process clause, as a sufficient "minimum connection, between a state and the person, property or transaction it seeks to tax . . . ." (Internal quotation marks omitted.) *MeadWestvaco Corp.* v. *Illinois Dept. of Revenue*, supra, 553 U.S. 24. It has been well settled for nearly one century that, without offending the due process clause, the state may tax "incomes accruing to nonresidents from . . . occupations carried on therein . . . ." *Shaffer* v. *Carter*, supra, 252 U.S. 52. When Allen earned the stock options as compensation, he was performing services in the state of Connecticut.[23] During the course of his service within the state, he enjoyed the benefits and protections attendant to employment within this state. See id., 50 ("[t]hat the [s]tate, from whose laws property and business and industry derive the protection and security without which production and gainful occupation would be impossible, is debarred from exacting a share of those gains in the form of income taxes for the support of the government, is a proposition so wholly inconsistent with fundamental principles as to be refuted by its mere statement").

It is without question that, in both substance and form, stock options are compensation for services per-

formed for the employer. As one scholar who has examined the use of stock option grants as compensation described them, "[o]ptions are the best compensation mechanism we have for getting managers to act in ways that ensure the long-term success of their companies and the well-being of their workers and stockholders." B. Hall, "What You Need to Know About Stock Options," 78 Harv. Bus. Rev. (March-April 2000), pp. 121–22. Indeed, by the late 1990s, "the grant-date value of stock options accounted for 40 percent of total pay for [chief executive officers of companies listed on the Standard and Poor's 500 index] . . . ." B. Hall & K. Murphy, "Optimal Exercise Prices for Executive Stock Options," 90 Am. Econ. Rev. 209 (2000).[24] Both federal and state tax law acknowledge this practical reality regarding the compensatory nature of stock options and the income derived therefrom. The United States Supreme Court noted in *LoBue*, "it seems impossible to say that [the bargain transfer at the exercise of the stock option] was not compensation." *Commissioner of Internal Revenue* v. *LoBue*, supra, 351 U.S. 247; see also *Commissioner of Internal Revenue* v. *Smith*, 324 U.S. 177, 181–82, 65 S. Ct. 591, 89 L. Ed. 830 (1945) ("[h]ence the compensation for respondent's services, which the parties contemplated, plainly was not confined to the mere delivery to respondent of an option of no present value, but included the compensation obtainable by the exercise of the option given for that purpose"); *Rice* v. *Montgomery*, 104 Ohio App. 3d 776, 782–83, 663 N.E.2d 389 (1995) ("[the] plaintiff's exercise of the stock option did not yield income from stock as [the] plaintiff maintains, but rather yielded him earned compensation which took the form of stock attained at lower than market price" [internal quotation marks omitted]); 26 C.F.R. § 1.83-7 (a) ("[i]f the option is exercised . . . the employee or independent contractor realizes *compensation* upon such transfer" [emphasis added]). Because Allen was awarded the stock options as compensation for performing services in Connecticut, there is a sufficient jurisdictional nexus for Connecticut to impose a tax on the compensation.

The plaintiffs claim, however, that the fact that Allen exercised the stock options after he had ceased performing services in Connecticut and began residing outside of Connecticut severs the jurisdictional nexus. The plaintiffs, in support of their argument, rely on *Chase Manhattan Bank* v. *Gavin*, supra, 249 Conn. 202–203, in which this court reasoned as follows: "We think that it is implicit in the due process test that the benefits afforded by the state to a domiciliary, or its functional equivalent, justifying the taxation of its income, must generally span the time period during which the income was earned, and not solely antedate that time period without any continuing effect."[25] (Internal quotation marks omitted.) This principle does not stretch so far as to require that the benefits afforded by the state

"must generally span . . . and not solely antedate" *realization* of the income as the plaintiffs suggest; rather, it demands that enjoyment of the benefits provided by the state be contemporaneous with *earning* the income. Thus, the intervening passage of time between Allen's cessation of employment in the state and the exercise of the stock options he earned performing services in the state does not deprive the state of jurisdiction to tax the income derived from the exercise of the stock options.

The plaintiffs further contend that the income realized from the exercise of the stock options is not a result of the performance of services in Connecticut; but rather that the income is a result of the appreciation in value of the underlying stock, which is not connected to Allen's performance of services within the state. We disagree with this characterization of the income derived from the exercise of stock options.[26] The plaintiffs rightly point out that the stock options had no reasonably ascertainable fair market value at the time the options were awarded and, consequently, were not subject to taxation at the time they were granted. See 26 U.S.C. § 83 (e) (3). Stock options do, however, have value at the time of award. Nonqualified stock options would not be contemplated as a form of compensation if they did not constitute value to the parties of an employment contract. The difficulty lies in quantifying the value of the stock options.[27] By implementing the applicable regulations, both the United States Internal Revenue Service and the defendant determined that, rather than taxing the speculative value of the options at the time of award, the better course of action is to calculate the taxable income on the basis of the "bargain element" at the time of exercise. See *Rice* v. *Montgomery*, supra, 104 Ohio App. 3d 781 ("[Federal law] resolves the difficulty of valuing a nontransferable stock option by waiting until the option is exercised, at which time there is a recognition of income equal to the difference between the option price and the fair market value of the stock at the time of the exercise. At the moment that the income is recognized, a fair market value can be assigned to the stock option."). For compensation in the form of stock options, the intended compensation for services performed within the state is measured and taxed at the time the options are exercised. See *Rank* v. *United States*, supra, 345 F.2d 343 ("[a]nd whatever the conceptual shortcomings might be to a theory which attributes to a right then having no ascertainable value the value of its fruits when and as they acquire demonstrable worth, it makes tax sense if not common sense"). Due process does not demand that compensation be taxed by the application of a formula that utilizes economic values that are ascertainable only contemporaneously with the performance of services in the taxing state. Rather, it is sufficient to satisfy due process requirements that, for a state to impose a tax on the

compensation of a nonresident, the taxpayer has performed the services in the taxing state. *Shaffer* v. *Carter*, supra, 252 U.S. 52.[28]

Finally, we briefly address the second prong of the due process test, which requires "a rational relationship between the tax and the values connected with the taxing [s]tate." (Internal quotation marks omitted.) *MeadWestvaco Corp.* v. *Illinois Dept. of Revenue*, supra, 553 U.S. 24. As the plaintiffs concede, this prong's "principal application has been in cases in which a state seeks to attribute to its tax base some portion of the property or income of a multistate business enterprise that does business in the state. . . . [T]he cases require, in general terms, that only a fair proportion of the property or income of the total enterprise be attributed to the taxing state." *Chase Manhattan Bank* v. *Gavin*, supra, 249 Conn. 185 n.14. Because it is undisputed that Allen was awarded the stock options for performing services only in Connecticut and this issue does not implicate a multistate business enterprise, we perceive this prong to be inapplicable to the constitutional analysis.

Accordingly we conclude that § 12-711(b)-18 of the regulations applies to the plaintiffs in this case and, as applied, does not violate the due process clause of the fourteenth amendment.

The form of the judgment with respect to the 2002 taxable year is improper, the judgment is reversed with respect to that taxable year and the case is remanded with direction to dismiss the plaintiffs' corresponding appeal for lack of subject matter jurisdiction; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.

* December 28, 2016, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The plaintiffs appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] "Stock options [also known as call options] allow an employee to buy the employer's stock at a specified future date at a price [know as the strike price or exercise price] fixed on the date that the stock is granted. Stock options are granted with the expectation that the stock will increase in price during the intervening period, thus allowing the grantee the right to buy the stock significantly below its market price." (Internal quotation marks omitted.) *Scully* v. *US WATS, Inc.*, 238 F.3d 497, 507 (3d Cir. 2001). "Statutory stock options are compensatory options that meet certain criteria and are treated differently under the Internal Revenue Code." *United States* v. *Tuff*, 469 F.3d 1249, 1251 n.2 (9th Cir. 2006). Options that do not meet these requirements are called "nonqualifed" or "nonstatutory" stock options. Id.

[3] While both Jefferson Allen and Evita Allen are the plaintiffs in this appeal, only income earned by Jefferson Allen is relevant to this appeal. For the sake of simplicity, hereinafter we refer to Jefferson Allen, individually, by his surname.

[4] It is undisputed that all of the options pertinent to this appeal did not have a readily ascertainable fair market value at the time they were awarded to Allen.

[5] In August, 2005, Premcor was acquired by Valero, Inc. (Valero). As a consequence of the acquisition, Allen's stock options were converted to options for Valero stock. For the sake of consistency, we refer to the options Allen earned in 2005 as Premcor options.

[6] General Statutes § 12-730 provides relevant part: "[A]ny taxpayer aggrieved because of any determination or disallowance by the commissioner under section 12-729, 12-729a or 12-732 may, within one month after notice of the commissioner's determination or disallowance is mailed to the taxpayer, take an appeal therefrom to the superior court for the judicial district of New Britain . . . ."

[7] The parties agree that the due date for filing an income tax return for the taxable year 2002 was April 15, 2003. See General Statutes § 12-719 (a) ("[t]he income tax return required under this chapter shall be filed on or before the fifteenth day of the fourth month following the close of the taxpayer's taxable year"). Consequently, the last day that the plaintiffs could have filed a claim for a refund was April 15, 2006. The plaintiffs filed their claim for a refund for income tax paid for taxable year 2002 on or about October 13, 2009.

[8] General Statutes § 12-732 (a) (1) provides in relevant part: "If any tax has been overpaid, the taxpayer may file a claim for refund in writing with the commissioner within three years from the due date for which such overpayment was made, stating the specific grounds upon which the claim is founded, provided if the commissioner has extended the time for the filing of an income tax return by the taxpayer, the taxpayer may file a claim for refund within three years after the date on which the income tax return is filed by the taxpayer or within three years after the extended due date of the income tax return, whichever is earlier. . . . Failure to file a claim within the time prescribed in this section constitutes a waiver of any demand against the state on account of overpayment. . . ."

[9] With respect to the plaintiffs' claim that the prescribed three year limitation period set forth in § 12-732 is not jurisdictional, we find their reliance upon *Williams* v. *Commission on Human Rights & Opportunities*, supra, 257 Conn. 258, to be misplaced. The statute at issue in *Williams* did not implicate sovereign immunity. Thus, that case furnishes no persuasive basis to deviate from our firmly rooted principles of sovereign immunity. The plaintiffs' citation to *Wiele* v. *Board of Assessment Appeals*, 119 Conn. App. 544, 988 A.2d 889 (2010) is inapposite for much the same reason. That case concerned a municipal tax appeal, and, accordingly, did not implicate sovereign immunity. See *Vejseli* v. *Pasha*, 282 Conn. 561, 572, 923 A.2d 688 (2007) ("[W]e expressly have recognized that, [u]nlike the state, municipalities have no sovereign immunity from suit. . . . Rather, municipal governments have a limited immunity from liability." [Internal quotation marks omitted.]).

[10] The plaintiff in *DaimlerChrysler Corp.* also did not qualify as a " 'taxpayer' " as that term was contemplated by the Connecticut Sales and Use Taxes Act, General Statutes § 12-406 et seq. *DaimlerChrysler Corp.* v. *Law*, supra, 284 Conn. 716.

[11] The plaintiff in *Crystal*, the Federal Deposit Insurance Corporation, was appointed as receiver to two insolvent banks. *Federal Deposit Ins. Corp.* v. *Crystal*, supra, 251 Conn. 750–51 n.2. As a result, the plaintiff succeeded to the assets and liabilities of the insolvent banks, including the banks' claims against the Commissioner of Revenue Services in that case. Id.

[12] General Statutes § 12-225 (b) (1) provides in relevant part: "Any company which fails to include in its return items of deductions or includes items of nontaxable income or makes any other error in such return may, within three years from the due date of the return, file with the commissioner an amended return, together with a claim for refund of taxes overpaid as shown by such amended return. Failure to file a claim within the time prescribed in this section constitutes a waiver of any demand against the state on account of overpayment. . . ."

[13] Consistent with our principles with respect to sovereign immunity and subject matter jurisdiction, the three year period may not be equitably tolled. See *Williams* v. *Commission on Human Rights & Opportunities*, supra, 257 Conn. 277 (noting that "the notion of equitable tolling . . . is inconsistent with the concept of subject matter jurisdiction").

[14] "'Adjusted gross income' means the adjusted gross income of a natural person with respect to any taxable year, as determined for federal income tax purposes and as properly reported on such person's federal income tax return." General Statutes § 12-701 (a) (19). " 'Connecticut adjusted gross income' " means adjusted gross income subject to modifications not relevant to this appeal. General Statutes § 12-701 (a) (20).

[15] "We long have held that when our tax statutes refer to the federal tax code, federal tax concepts are incorporated into state law. . . . Although this rule does not require the wholesale incorporation of the entire body

of federal tax principles into our state income tax scheme, where a reference to the federal tax code expressly is made in the language of a statute, and where incorporation of federal tax principles makes sense in light of the statutory language at issue, our prior cases uniformly have held that incorporation should take place." (Citations omitted; internal quotation marks omitted.) *Berkley* v. *Gavin*, 253 Conn. 761, 773, 756 A.2d 248 (2000).

[16] Title 26 of the Code of Federal Regulations, § 1.83-7 (a), provides in relevant part: "If there is granted to an employee or independent contractor (or beneficiary thereof) in connection with the performance of services, an option to which section 421 (relating generally to certain qualified and other options) does not apply, section 83(a) shall apply to such grant if the option has a readily ascertainable fair market value (determined in accordance with paragraph [b] of this section) at the time the option is granted. The person who performed such services realizes compensation upon such grant at the time and in the amount determined under section 83(a). If section 83(a) does not apply to the grant of such an option because the option does not have a readily ascertainable fair market value at the time of grant, sections 83(a) and 83(b) shall apply at the time the option is exercised or otherwise disposed of, even though the fair market value of such option may have become readily ascertainable before such time. If the option is exercised, sections 83(a) and 83(b) apply to the transfer of property pursuant to such exercise, and the employee or independent contractor realizes compensation upon such transfer at the time and in the amount determined under section 83(a) or 83(b). . . ."

[17] Because we conclude that § 12-711(b)-18 (a) of the regulations is unambiguous, the plaintiffs are not entitled to a construction in their favor. See *Sikorsky Aircraft Corp.* v. *Commissioner of Revenue Services*, 297 Conn. 540, 561, 1 A.3d 1033 (2010).

[18] We disagree with the plaintiffs' contention that the contrast between subsections (a) and (c), i.e., the fact that the latter contains a formula while the former does not, highlights the ambiguity in § 12-711(b)-18 of the regulations. Subsection (c) delineates the quantum of income that, pursuant to subsection (a), is defined as includable in Connecticut adjusted gross income; it is not itself a definition of income includable in Connecticut adjusted gross income separate and apart from subsection (a).

[19] Title 4 of the United States Code, § 114 (a), provides: "No State may impose an income tax on any retirement income of an individual who is not a resident or domiciliary of such State (as determined under the laws of such State)."

[20] "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1.

[21] In addition to the due process clause, the commerce clause of the federal constitution places an additional limit upon the state's power to impose a tax. *MeadWestvaco Corp.* v. *Illinois Dept. of Revenue*, 553 U.S. 16, 24, 128 S. Ct. 1498, 170 L. Ed. 2d 404 (2008) ("[t]he [c]ommerce [c]lause forbids the [s]tates to levy taxes that discriminate against interstate commerce or that burden it by subjecting activities to multiple or unfairly apportioned taxation").

[22] In *Quill*, the United States Supreme Court concluded that the due process requirements were satisfied by the fact that the taxpayer "engaged in continuous and widespread solicitation of business within [the] [s]tate" such that the taxpayer "clearly ha[d] fair warning that [its] activity may subject [it] to the jurisdiction of a foreign sovereign." (Internal quotation marks omitted.) *Quill* v. *North Dakota*, supra, 504 U.S. 308.

[23] We note also that the plaintiffs also enjoyed the benefits and protections afforded domiciliaries while Allen was performing the services for which he was granted the stock options.

[24] While it is true that use of stock option awards as a form of executive compensation has declined recently; S. Hannes & A. Tabbach, "Executive Stock Options: The Effects of Manipulation on Risk Taking," 38 J. Corp. L. 533, 539–40 (2013); this in no way alters the fact that such awards are compensation for services performed.

[25] The plaintiffs also rely on a recent Ohio Supreme Court case which stated that, "[u]nder [*Shaffer* v. *Carter*, supra, 252 U.S. 37], the income of a nonresident is the 'res,' or thing, that lies within the taxing jurisdiction by virtue of the activity being performed within that jurisdiction. Thus, local taxation of a nonresident's compensation for services must be based on the

location of the taxpayer when the services were performed." *Hillenmeyer* v. *Cleveland Board of Review*, 144 Ohio St. 3d 165, 176, 41 N.E.3d 1164, cert. denied, U.S. , 136 S. Ct. 491, 193 L. Ed. 2d 352 (2015).

[26] The plaintiffs' reliance upon the "secondary holding" in *Molter* v. *Dept. of Treasury*, 443 Mich. 537, 551–52, 505 N.W.2d 244 (1993), is also misplaced. In that case, the Michigan Supreme Court held that interest earned, and subsequently disbursed to a nonresident, as part of a deferred compensation plan was not attributable to services performed in the taxing state. Id. That case, however, turned on the interpretation of a state statute that subjected interest income to taxation, not on the due process clause. See id., 552 n.13 (distinguishing Michigan statute from related New Jersey statute).

[27] There is a methodology for ascertaining the present value of stock options. "The Black-Scholes option-pricing model is a standard model used by analysts for pricing options. Fisher Black and Myron Scholes, the developers of the model, won Nobel Prizes in economics following the development of the model. The existence of variables (the risk free rate, volatility of the underlying stock, expiration date of the option, etc.) may cause the model to have less reliability, however, in certain circumstances." *In re Coleman Co. Inc. Shareholders*, 750 A.2d 1202, 1208 n.13 (Del. Ch. 1999).

[28] We are unmoved by the plaintiffs' warning that "horribles would parade" as a result of our conclusion. Contrary to the plaintiffs' claim, a state of prior residence would not be able to impose a tax on a nonresident taxpayer living and working in another state simply because the taxpayer enjoyed benefits and protection during his time of residence in that state. Jurisdiction is not predicated on whether a taxpayer has ever enjoyed the benefits or protections of a state "that made the executive's income possible"; instead, "the benefits afforded by the state . . . must generally span the time period during which the income was *earned* . . . ." (Emphasis added.) *Chase Manhattan Bank* v. *Gavin*, supra, 249 Conn. 202–203.

---