******************************************

The "officially released" date that appears near the be-
ginning of each opinion is the date the opinion will be pub-
lished in the Connecticut Law Journal or the date it was
released as a slip opinion. The operative date for the be-
ginning of all time periods for filing postopinion motions
and petitions for certification is the "officially released"
date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecticut
Reports and Connecticut Appellate Reports. In the event of
discrepancies between the advance release version of an
opinion and the latest version appearing in the Connecticut
Law Journal and subsequently in the Connecticut Reports
or Connecticut Appellate Reports, the latest version is to
be considered authoritative.

The syllabus and procedural history accompanying the
opinion as it appears in the Connecticut Law Journal and
bound volumes of official reports are copyrighted by the
Secretary of the State, State of Connecticut, and may not
be reproduced and distributed without the express written
permission of the Commission on Official Legal Publica-
tions, Judicial Branch, State of Connecticut.
******************************************

# IN RE ELIANAH T.-T. ET AL.*
## (SC 19902)

Rogers, C. J., and Palmer, Eveleigh, McDonald,
Espinosa, Robinson and Vertefeuille, Js.**

*Syllabus*

Pursuant to statute (§ 17a-10 [c]), the Commissioner of Children and Families
may authorize, on the advice of a licensed physician, "medical treatment,
including surgery, to insure the continued good health or life" of a child
committed to his or her custody.

The respondent parents appealed from the decision of the trial court granting
the petitioner, the Commissioner of Children and Families, permission
to vaccinate their minor children. The children had been removed from
the respondents' custody after a social worker employed by the Depart-
ment of Children and Families discovered the children covered in bruises
and in a generally poor state of hygiene. The trial court subsequently
rendered judgments adjudicating the children neglected and, with the
consent of the parties, committed the children to the temporary custody
of the commissioner. At that time, the respondents made a motion
seeking to prevent, on the basis of certain religious beliefs, the commis-
sioner from authorizing vaccinations for the children pursuant to § 17a-
10 (c) in accordance with the department's usual practice. The trial
court denied the respondents' motion and granted the commissioner
permission to vaccinate the children, concluding that, because the com-
missioner had custody of and control over the children, she had the
authority and obligation to vaccinate the children pursuant to § 17a-10
(c) notwithstanding the respondents' religious objection. On the respon-
dents' subsequent appeal, *held* that the trial court improperly granted
the commissioner permission to vaccinate the children in light of the
respondents' religious objection, this court having concluded that vacci-
nations do not constitute medical treatment under § 17a-10 (c) and that,
therefore, the commissioner is not authorized to vaccinate children
committed to her temporary custody without parental consent; although
the apparent conflict between the ordinary meaning of the phrase "medi-
cal treatment," which contemplates curing an existing condition, and
the phrase "insure the continued good health or life of the child," which
may reasonably be read to permit preventative care, created ambiguity
in § 17a-10 (c) with respect to vaccinations, which are prophylactic in
nature, the modification of the phrase "medical treatment" by the phrase
"including surgery," the existence of related statutes explicitly authoriz-
ing preventative measures in other contexts, and an examination of
relevant portions of legislative history supported the conclusion that
the legislature intended to grant the commissioner only limited authority
to provide medical treatment without parental consent in emergency sit-
uations.

(*Two justices concurring separately in one opinion*)

Argued May 4—officially released August 15, 2017***

*Procedural History*

Petitions by the Commissioner of Children and Fami-
lies to adjudicate the respondents' minor children
neglected, brought to the Superior Court in the judicial
district of New Britain, Juvenile Matters, where the
respondents entered pleas of nolo contendere as to
the neglect allegations; thereafter, the court, *Abery-
Wetstone, J.*, issued an order adjudicating the minor
children neglected and transferring temporary custody
of the minor children to the Commissioner of Children
and Families; subsequently, the court, *Abery-Wetstone,
J.*, denied the respondents' motion seeking to prevent
the Commissioner of Children and Families from vacci-

nating the minor children, from which the respondents appealed. *Reversed; judgment directed.*

*Benjamin M. Wattenmaker*, with whom was *Joshua Michtom*, for the appellants (respondents).

*Rosemarie T. Weber*, assistant attorney general, with whom were *Evan O'Roark*, assistant attorney general, and, on the brief, *George Jepsen*, attorney general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Opinion*

ROBINSON, J. The dispositive issue in this appeal is whether General Statutes § 17a-10 (c)[1] authorizes the petitioner, the Commissioner of Children and Families (commissioner), to vaccinate a child placed temporarily in her custody, over the objection of that child's parents. The respondents, Giordan T. and Nicanol T., appeal[2] from the decision of the trial court denying their motion seeking to prevent vaccination of their minor children, Elianah T.-T. and Nathaniel T.-T. On appeal, the respondents claim, inter alia, that § 17a-10 (c) does not authorize the commissioner to vaccinate the children over the respondents' objection because vaccinations do not constitute "medical treatment" within the meaning of that statute.[3] We agree with this claim and conclude that vaccinations are not "medical treatment" as contemplated by § 17a-10 (c). Accordingly, we reverse the decision of the trial court.

The record reveals the following undisputed facts and procedural history. The Department of Children and Families (department) first became involved with the respondents' family on April 21, 2016, after the Rocky Hill Police Department was called to investigate a physical altercation between the respondents. The department learned from police that the respondents and the children, who were one and two years old at the time, had been living out of a minivan for several months as they moved from Florida to Connecticut, making stops in North Carolina, Colorado, and New York. The police subsequently arrested both respondents for disorderly conduct. Following the respondents' arrest, a social worker from the department met with the children at the police station and observed that they smelled of urine, were filthy, and were covered with multiple bruises. The department then invoked a ninety-six hour hold over the children pursuant to General Statutes § 17a-101g (e). The respondent mother gave the department permission to have the children medically evaluated.[4]

Thereafter, on April 25, 2016, the commissioner filed neglect petitions as to both of the children and sought ex parte orders of temporary custody. On April 29, 2016, the trial court sustained the orders of temporary custody and ordered specific steps to facilitate reunification of the children with the respondents pursuant to General Statutes § 46b-129. At a hearing held on August 23, 2016, the respondents entered pleas of nolo contendere as to the neglect allegations and agreed to commit the children temporarily to the care and custody of the commissioner. The trial court entered findings of neglect, rendered judgments on the petitions in accordance with the respondents' pleas, and committed the children to the custody of the commissioner. At that hearing, the parties advised the court that the respondents, on the basis of their sincerely held reli-

gious beliefs, objected to vaccination of the children for common childhood diseases in accordance with the department's usual practice. The respondents then made an oral motion seeking to prevent vaccination, to which the commissioner objected.

On November 17, 2016, the trial court held a one day hearing to determine whether the commissioner had the authority to vaccinate the children in light of the respondents' religious objection. During the hearing, the commissioner presented four witnesses: (1) Iris Thompson, a nurse consultant employed by the department; (2) Stephen Humphrey, a clinical psychologist who had conducted a court ordered evaluation of the respondents; (3) Fredericka Wolman, a pediatrician employed as the department's director of pediatrics; and (4) Jessica Nordlund, a department social worker. Thompson and Humphrey testified that they had communicated with the respondents regarding the immunizations and that the respondents never expressed a religious objection. Wolman testified about the medical importance of immunizations, and Nordlund testified that she had to call numerous physicians before locating one who would treat unvaccinated children. In response, the respondent mother testified about her religious beliefs.

On January 13, 2017, the trial court issued a memorandum of decision denying the respondents' motion and granting the commissioner permission to vaccinate the children. The trial court stated that it "need not reach the issue of [the respondent] mother's religious belief, because the children are committed to the [custody of the commissioner]." The trial court similarly determined that the exemption provided by General Statutes § 10-204a to the state's vaccination requirement for school children, for religious objections to immunization, did not apply in this case because the children were committed to the care and custody of the commissioner. The court concluded that the crucial issue in this case was the fact that the commissioner had custody of and control over the children, which gave the commissioner "the authority and obligation to vaccinate" them pursuant to § 17a-10 (c). This appeal followed.[5] See footnote 2 of this opinion.

On appeal, the respondents claim, inter alia, that § 17a-10 (c) does not authorize the commissioner to vaccinate the children over the respondents' objection because vaccinations are not "medical treatment" as contemplated by the statute. The respondents contend that the plain language of § 17a-10 (c) indicates that preventative vaccinations are not "medical treatment" because "treatment" is defined as the steps taken to cure an injury or disease. Thus, the respondents argue that the commissioner may authorize "medical treatment" without parental consent only to address an *existing* injury, illness, or disease. Because the commis-

sioner did not seek to vaccinate the children to cure an existing illness or disease, but rather as a precautionary measure, the respondents contend that such vaccinations do not fall within the plain language of the statute. Alternatively, the respondents contend that, even if the court deems the phrase "medical treatment" ambiguous, the legislative history of § 17a-10 (c) establishes that the legislature intended the statute to give the commissioner only limited authority to provide medical treatment without parental consent in emergency situations.

In response, the commissioner contends that "[t]he plain language of § 17a-10 (c), very simply, gives the commissioner the authority to provide medical treatment to children in its care, consistent with the child's best interests." In the commissioner's view, § 17a-10 (c) is plain and unambiguous, and the phrase "medical treatment" is commonly understood to include the "mitigat[ion]" of an illness or disease. Accordingly, the commissioner contends that vaccinations are "medical treatment" because they are a medicine administered by a physician to mitigate against diseases. We, however, agree with the respondents and conclude that vaccinations do not constitute "medical treatment" under § 17a-10 (c).

The issue of whether § 17a-10 (c) authorizes the commissioner to vaccinate children committed to her temporary custody over parental objection presents a question of statutory construction over which we exercise plenary review. *Gonzalez* v. *O & G Industries, Inc.*, 322 Conn. 291, 302, 140 A.3d 950 (2016). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) Id., 302–303. Importantly, "ambiguity exists only if the statutory language at issue is susceptible to more than one plausible interpretation." *State* v. *Orr*, 291 Conn. 642, 654, 969 A.2d 750 (2009). In other words, "statutory language does not become ambiguous merely

because the parties contend for different meanings." (Internal quotation marks omitted.) *Allen* v. *Commissioner of Revenue Services*, 324 Conn. 292, 309, 152 A.3d 488 (2016).

In accordance with § 1-2z, we begin our analysis with the relevant statutory text. Section 17a-10 (c) provides in relevant part: "When deemed in the best interests of a child in the custody of the commissioner, the commissioner, the commissioner's designee, a superintendent or assistant superintendent or, when the child is in transit between department facilities, a designee of the commissioner, may authorize, on the advice of a physician licensed to practice in the state, *medical treatment, including surgery*, to insure the continued good health or life of the child. . . ." (Emphasis added.)

As the statute does not define the phrase "medical treatment," in accordance with General Statutes § 1-1 (a), we look to the common understanding expressed in dictionaries in order to afford the term its ordinary meaning. See, e.g., *Standard Oil of Connecticut, Inc.* v. *Administrator, Unemployment Compensation Act*, 320 Conn. 611, 645, 134 A.3d 581 (2016). The American Heritage College Dictionary (4th Ed. 2007) defines "treatment" as the "[a]dministration or application of *remedies* to a patient for a disease or injury . . . ." (Emphasis added.) Similarly, Black's Law Dictionary (4th Ed. 1968) defines the word "treatment" as "[a] broad term covering all *the steps taken to effect a cure of an injury or disease*; the word including examination and diagnosis as well as application of *remedies*." (Emphasis added.) These definitions, and particularly their focus on remedies,[6] make clear that the phrase "medical treatment" in § 17a-10 (c) contemplates the cure of an existing illness, injury, or disease.

The commissioner, however, relies on other definitions of "treatment" that include the "mitigation" of a disease or illness. See The American Heritage Dictionary of the English Language (5th Ed. 2011) (defining "treatment" as "[t]he use of an agent, procedure, or regimen, such as a drug, surgery, or exercise, in an attempt to cure or mitigate a disease, condition, or injury"). The definition of "mitigate," however, is to "make or become milder, less severe, less rigorous or less painful . . . ." Webster's New World Dictionary (2d Ed. 1972). Thus, the commissioner's contention that the phrase "medical treatment" includes vaccinations because they "mitigate" against the possibility of contracting a disease does not comport with the plain meaning of the word "mitigate" because the definition of that term contemplates addressing a presently existing condition. Put differently, one cannot mitigate an ailment that may or may not arise in the future.

Ambiguity arises, however, because the plain meaning of "medical treatment" with respect to vaccinations conflicts with the subsequent phrase in § 17a-10 (c),

namely, to "insure the continued good health or life of the child." The phrase "continued good health" reasonably may be read to suggest that the commissioner may seek preventive "medical treatment" for a healthy child in her custody. This contrasts with the plain meaning of "medical treatment," which requires an existing illness to trigger the commissioner's authority to seek "medical treatment." Accordingly, we conclude that this apparent conflict renders § 17a-10 (c) ambiguous.

In resolving this ambiguity, we first look to other portions of the language in § 17a-10 (c) and related statutes. We begin with the well settled principle that, "[a]ccording to the [doctrine] of ejusdem generis, unless a contrary intent appears, where general terms are followed by specific terms in a statute, the general terms will be construed to embrace things of the same general kind or character as those specifically enumerated." (Internal quotation marks omitted.) *Balloli* v. *New Haven Police Dept.*, 324 Conn. 14, 23, 151 A.3d 367 (2016). Here, in § 17a-10 (c), the phrase "medical treatment" is modified by the phrase "including surgery." As "medical treatment" is a general term and "surgery" is more specific, "medical treatment" should be construed to include medical procedures akin to surgery, such as procedures undertaken to remedy an existing illness, injury, or disease, rather than prophylactic measures such as vaccinations.

This reading of § 17a-10 (c) is also supported by reference to related statutes contained in title 17a of the General Statutes. See, e.g., *Mayer* v. *Historic District Commission*, 325 Conn. 765, 777, 160 A.3d 333 (2017) ("looking beyond [General Statutes] § 8-8 [a] [1], related statutes affecting land use appeals demonstrate that, if the legislature wanted to create statutory aggrievement in historic district cases, it could have done so expressly" [internal quotation marks omitted]). In contrast to § 17a-10 (c), several other provisions in title 17a specifically reference both treatment *and prevention*. See General Statutes § 17a-49 (a) (directing the commissioner to develop programs for the "treatment and prevention" of child abuse and neglect); General Statutes § 17a-22g (a) (discussing behavioral health and substance abuse "prevention and treatment"). Had the legislature intended for § 17a-10 (c) to allow for preventative measures, it could have included that language in this provision. See, e.g., *State* v. *Heredia*, 310 Conn. 742, 761, 81 A.3d 1163 (2013) ("[w]hen a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed" [internal quotation marks omitted]).[7]

If the legislature's intent is clear from the statute's plain and unambiguous language, our inquiry ends. See, e.g., *State* v. *Wright*, 320 Conn. 781, 801, 135 A.3d 1

(2016). Where, as here, however, "the statute is ambiguous . . . we go on to consider extratextual evidence of its meaning, such as the statute's legislative history, the circumstances surrounding its enactment, the legislative policy the statute implements, and the statute's relationship with existing legislation and common-law principles." Id.

Accordingly, we examine the legislative history of § 17a-10 (c). As originally enacted in 1969, § 17a-10 did not authorize the commissioner to seek any medical treatment for children in his or her care. See Public Acts 1969, No. 664, § 11. The legislative history of No. 295 of the 1971 Public Acts, which added the "medical treatment" language to § 17a-10, indicates that the legislature did not contemplate extending the commissioner's authority beyond emergency situations. As one of the sponsors of the underlying bill explained,[8] that language "provides that the [commissioner] shall be empowered and authorized to have *emergency medical treatment* given to any ward placed in his custody regardless of which institution he is situated in. This presently is not possible and the Attorney General last year was forced to give a ruling indicating that *the [c]ommissioner had no power even in the face of an emergency. So this clarifies that situation . . . .*"[9] (Emphasis added.) 14 H.R. Proc., Pt. 5a, 1971 Sess., p. 2201, remarks of Representative John Papandrea. Similarly, during the hearings on the bill, its drafter,[10] an employee of the department, testified as follows: "The other part of this [b]ill, relates to medical care to children [within] our custody. They provide that the [c]ommissioner, or his designee, may, upon the advice of a licensed physician or dentist, *authorize emergency dental care or physical care, including surgery*, for a child in our custody. This we think is a necessary provision. We find that as a matter of fact, children are most apt to be accident prone on weekends and that's the most difficult time to get a hold of their parents. We find further, that many of our parents who have children are not easily located." (Emphasis added.) Conn. Joint Standing Committee Hearings, Corrections, Welfare and Humane Institutions, Pt. 1, 1971 Sess., p. 186, remarks of John Dorman. Thus, the legislative history demonstrates that the 1971 amendments to § 17a-10 were far from an expansive grant of authority to provide routine preventative care to children committed to temporary custody but, rather, only were intended to grant the commissioner the limited authority to provide "medical treatment" during an emergency if and when a child's parents could not be reached.[11]

Accordingly, we conclude that § 17a-10 (c) does not authorize the commissioner to vaccinate children committed to her temporary custody without parental consent.[12] The trial court, therefore, improperly granted the commissioner permission to vaccinate the children in light of the respondents' objection.

The decision of the trial court denying the respondents' motion seeking to prevent vaccination of the children is reversed and the case is remanded to that court with direction to grant the respondents' motion.

In this opinion the other justices concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** The listing of judges reflects their seniority status on this court as of the date of oral argument.

*** August 15, 2017, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] General Statutes § 17a-10 (c) provides: "When deemed in the best interests of a child in the custody of the commissioner, the commissioner, the commissioner's designee, a superintendent or assistant superintendent or, when the child is in transit between department facilities, a designee of the commissioner, may authorize, on the advice of a physician licensed to practice in the state, medical treatment, including surgery, to insure the continued good health or life of the child. Any of said persons may, when he or she deems it in the best interests of the child, authorize, on the advice of a dentist licensed to practice in the state, dentistry, including dental surgery, to insure the continued good health of the child. Upon such authorization, the commissioner shall exercise due diligence to inform the parents or guardian prior to taking such action, and in all cases shall send notice to the parents or guardian by letter to their last-known address informing them of the actions taken, of their necessity and of the outcome, but in a case where the commissioner fails to notify, such failure will not affect the validity of the authorization."

[2] The respondents appealed from the decision of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] The respondents also raise several constitutional claims. Specifically, they argue that, as applied, § 17a-10 (c) violates (1) their fundamental liberty interest in directing the care and religious education of the children, and (2) their right to procedural due process. Because we resolve this appeal on statutory grounds, we do not address these claims. See, e.g., *State* v. *Brown*, 309 Conn. 469, 478–79 n.11, 72 A.3d 48 (2013) ("[i]t is well established that this court has a basic judicial duty to avoid deciding a constitutional issue if a nonconstitutional ground exists that will dispose of the case" [internal quotation marks omitted]).

[4] Medical tests revealed that both of the children have Von Willebrand's Disease, a genetic blood disorder that may have caused their bruising.

[5] The trial court stayed execution of its decision until February 22, 2017, the date on which the respondents appealed. The parties disagree about whether the filing of the present appeal triggered an automatic stay pursuant to Practice Book § 61-11. We agree with the commissioner's argument that an automatic stay did not arise from this appeal because § 61-11 (b) specifically excludes juvenile matters, such as the present case, brought pursuant to chapter 33a of our rules of practice. Nevertheless, on May 1, 2017, this court, sua sponte, ordered a stay of the trial court's decision pending resolution of the present appeal. See Practice Book § 60-2.

[6] The American Heritage College Dictionary (4th Ed. 2007) defines "remedy" as "[s]omething, such as medicine, that relieves pain, cures disease, or corrects a disorder." See also Webster's New World Dictionary (2d Ed. 1972) (defining remedy as "any medicine or treatment that cures, heals, or relieves a disease or bodily disorder or tends to restore health").

[7] We note that other provisions in title 17a of the General Statutes provide additional circumstances in which the commissioner may authorize medical care for children. For example, § 17a-101g (f) provides in relevant part that, during a ninety-six hour hold, the commissioner "shall provide the child with all necessary care, *including medical care*, which may include an examination by a physician or mental health professional with or without the consent of the child's parents, guardian or other person responsible for the child's care, provided reasonable attempts have been made to obtain consent of the child's parents or guardian or other person responsible for the care of such child. During the course of a medical examination, *a*

*physician may perform diagnostic tests and procedures necessary for the detection of child abuse or neglect. . . .*" (Emphasis added.) Thus, while title 17a enumerates several instances in which the commissioner may authorize medical care, it does not provide for the authorization of preventative care, such as vaccinations.

[8] When considering legislative history, "[w]e pay particular attention to statements of the legislators who sponsored the bill." *Doe* v. *Marselle*, 236 Conn. 845, 852 n.9, 675 A.2d 835 (1996).

[9] We note that we have not reviewed the opinion of the Attorney General discussed in the legislative history because it is not included in the parties appendices and was not readily available in the Connecticut State Library.

[10] "[I]t is now well settled that testimony before legislative committees may be considered in determining the particular problem or issue that the legislature sought to address by the legislation. . . . This is because legislation is a purposive act . . . and, therefore, identifying the particular problem that the legislature sought to resolve helps to identify the purpose or purposes for which the legislature used the language in question." (Internal quotation marks omitted.) *Hatt* v. *Burlington Coat Factory*, 263 Conn. 279, 314, 819 A.2d 260 (2003).

[11] We note that the respondents rely on § 10-204a (a) (3), which provides in relevant part that "[e]ach local or regional board of education, or similar body governing a nonpublic school or schools, shall require each child to be protected by adequate immunization against" numerous infectious diseases "before being permitted to enroll in any program operated by a public or nonpublic school under its jurisdiction. . . . Any such child who . . . (3) presents a statement from the parents or guardian of such child that such immunization would be contrary to the religious beliefs of such child or the *parents or guardian* of such child . . . shall be exempt from the appropriate provisions of this section. . . ." (Emphasis added.) The respondents contend that this statutory right is limited to parents or guardians with custody of a child.

In response, the commissioner argues that she, not the respondents, holds the right to claim any religious exemption to vaccination under § 10-204a (a) (3) because, under General Statutes § 46b-129 (j) (4), the trial court's order of temporary custody "revoked" the respondents' "guardianship rights" and rendered her the "guardian" of the children. The commissioner asserts that this order includes the rights and responsibilities of a "guardian" as defined by General Statutes § 17a-1 (12) (B), including the "authority to make major decisions affecting the child's or youth's welfare, including, but not limited to, consent determinations regarding . . . major medical, psychiatric or surgical treatment . . . ." The commissioner also relies on the similar definition of "guardianship" in the probate court statutes, specifically General Statutes § 45a-604 (5) (B).

As Chief Justice Rogers recognizes in her concurring opinion, the parties' statutory arguments on this point are complicated by the constitutional issues presented in view of the fact that, although the children have been committed to the custody of the commissioner, the respondents' parental rights remain intact. See *Walsh* v. *Jodoin*, 283 Conn. 187, 199, 925 A.2d 1086 (2007) ("[t]his court should try, whenever possible, to construe statutes to avoid a constitutional infirmity, but may not do so by rewriting the statute or by eschewing its plain language" [internal quotation marks omitted]); see also, e.g., *Santosky* v. *Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) ("[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the [s]tate"); *Diana H.* v. *Rubin*, 217 Ariz. 131, 139–40, 171 P.3d 200 (App. 2007) (statutory scheme recognizing mother's "residual parental rights" while child was in temporary custody of child welfare agency required demonstration of compelling state interest to override mother's religious objection to vaccination of child); *Dept. of Human Services* v. *S.M.*, 355 Or. 241, 253–55, 323 P.3d 947 (2014) (holding that state child welfare agency has "statutory authority to immunize [children in its custody] against common childhood diseases" but recognizing that agency's rules provide procedures to protect parents' constitutional rights during period of temporary custody).

Insofar as the commissioner relies primarily on § 17a-10 (c) as the basis for her authority to vaccinate the children in the present case, we leave to another day full consideration of the division of rights between the commissioner and parents under our statutory scheme while children are committed to temporary custody. This is particularly so, given that § 10-204a

(a) (3), the respondents' reliance on which occasioned the commissioner's reliance on § 17a-1 (12) (B), is inapplicable in this case given that the record does not indicate that an educational exemption is at issue—likely because the children have not yet reached school age. Moreover, the definition in § 17a-1 (12) (B), on which the commissioner relies, does not appear by its own terms to govern the *temporary* custody situation presented in this case, insofar as it specifically defines "[g]uardian" as a "person who has a judicially created relationship between a child or youth and such person that is intended to be *permanent and self-sustaining* . . . ." (Emphasis added.) Accordingly, we leave to another day a more comprehensive examination of the statutory scheme.

[12] While some may question the wisdom of not authorizing the commissioner to vaccinate children in her custody, "[p]articularly [i]n areas where the legislature has spoken . . . the primary responsibility for formulating public policy must remain with the legislature." *Mayer* v. *Historic District Commission*, supra, 325 Conn. 780. Given the policy considerations identified by the commissioner with respect to vaccination, "it remains the prerogative of the legislature to modify or clarify [the relevant statutory provisions] as it sees fit." (Internal quotation marks omitted.) Id., 780 n.10.

---